UNITED STATES of America, Appellee,

v.

LIZZA INDUSTRIES, INC., Herbert Hochreiter, Defendants-Appellants.

Nos. 985, 1067, Dockets 84–1449, 84–1450.

United States Court of Appeals, Second Circuit.

Argued April 8, 1985.

Decided Oct. 21, 1985.

Gerald Shargel, New York City (Michael Rosen, Saxe Bacon & Bolan, P.C., New York City, Jonathan J. Silbermann, New York City, of counsel), for defendants-appellants.

Marion J. Bachrach, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., Ronald E. De Petris, Chief Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before TIMBERS, VAN GRAAFEILAND and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Herbert Hochreiter and Lizza Industries, Inc. appeal their convictions, entered in the Eastern District of New York (Mishler, J.), for 32 counts of mail fraud in violation of 18 U.S.C. § 1341 (1982) and one count each of engaging in and using income derived from a pattern of unlawful activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1982). Hochreiter also appeals his conviction on one count of perjury, 18 U.S.C. § 1623 (1982).

Hochreiter claims that his perjury count should have been dismissed on due process grounds, and both appellants urge that the prosecutor's questioning of a government witness, which revealed that the witness was testifying under a grant of use immunity, was error requiring reversal. Appellants also contend that the district court incorrectly calculated the amount subject to forfeiture; they say that only net, not gross, profits are subject to forfeiture under RICO. Because none of appellants' claims is persuasive, we affirm.

## I  FACTS

The proof at trial showed that Lizza Industries, a major Long Island construction firm, and Herbert Hochreiter, Lizza's president and part-owner, were active participants in a large bid-rigging conspiracy. The conspirators colluded on the bidding of four publicly funded contracts for the repair and building of public roads and highways on Long Island.

Lizza Industries and Hochreiter, together with several other defendants, were first tried in March, 1984 on charges of using the mails to defraud the state and county, in violation of 18 U.S.C. § 1341 (1982), and with engaging in and using income derived from a pattern of unlawful activity in violation of 18 U.S.C. §§ 1961–1968 (1982). Although that trial ended in convictions for some defendants, there was a "hung" jury with respect to the two appellants. Hence, a mistrial was declared and a new trial scheduled.

Prior to the second trial, the prosecution sought and obtained a superseding indictment. The new indictment eliminated charges that related solely to the other codefendants, narrowed the scope of the fraud charge, eliminated a conspiracy count, and added a perjury count against Hochreiter, based on his testimony at the first trial. Hochreiter had lied to the jury about the *origin* of certain incriminating evidence.

At the same time that the prosecutors sought the new indictment, they were engaged in ongoing plea negotiations with both Lizza's and Hochreiter's defense counsel. The prosecution advised defense counsel that a perjury count was contemplated. When negotiations broke down, proceedings on the superseding indictment and added perjury count were initiated. Defendants moved unsuccessfully for dismissal or, alternatively, for severance of the new count. Upon denial of their motions, defendants proceeded to trial.

As part of its direct case, the government presented a former Lizza employee, Stephen Schreiber, as a witness. Schreib-

er, in response to prosecution questions, testified that he was appearing pursuant to an order that compelled his testimony and granted him use immunity, which ensured him that his testimony could not be used against him.[1] Based on this questioning, defense counsel unsuccessfully moved for a mistrial.

At trial, the only issue was the defendants' guilt. The trial judge bifurcated the trial and did not permit a determination of amounts to be forfeited until a jury first found defendants guilty of the underlying charges. The judge determined that gross rather than net profits could be used to calculate the forfeiture of profits from defendant's pattern of unlawful conduct. That is, the defendants could deduct direct costs incurred on each project for which they had been indicted, but could not deduct general overhead and business expenses that otherwise would have been incurred in the operation of their business.

Once the jury rendered its guilty verdict on the RICO count, the defense entered into a stipulation with the government regarding the amount of their gross profits. Under the gross profits formula agreed upon, Lizza would forfeit $1,000,000 and Hochreiter would forfeit $40,000. The parties also agreed that defendants reserved their right to appeal the trial court's ruling on the gross profits formula and the amount subject to forfeiture. The guilty verdicts against both defendants resulted in the recited forfeitures, plus fines of $52,000 and $62,000 against Lizza and Hochreiter respectively. In addition, Hochreiter was given two year concurrent sentences on each of the 34 counts for which he was convicted. The sentences

and forfeitures have all been stayed pending this appeal.

## II  DISCUSSION

### A.  Inclusion of the Perjury Count

Defendants contend that the government's inclusion of a perjury count against Hochreiter in the superseding indictment violated their due process rights. They argue that the government added the count only after plea negotiations preceding the second trial ended unsuccessfully, and that these circumstances demonstrate prosecutorial vindictiveness and require reversal.

■ As support for their claims defendants cite, *Thigpen v. Roberts,* — U.S. ——, 104 S.Ct. 2916, 82 L.Ed.2d 23 (1984), *Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), and *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). These cases all stand for the unassailable principle that the government violates a defendant's due process rights if it penalizes him in retaliation for his exercise of a legitimate right. *Thigpen, Blackledge,* and *Pearce* all dealt with post-conviction attempts by the prosecution to increase charges or penalties after defendants had pursued legitimate appeals or had collaterally attacked their convictions. In those cases the courts presumed that the prosecution retaliated against defendants because they exercised their rights to pursue constitutionally guaranteed remedies.

In *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the Supreme Court said that a defendant's due process rights are not violated when a prosecutor carries out a threat to reindict the defendant on more serious charges if he

---

1. The exact exchange was as follows:
    Q: [by prosecutor] Mr. Schreiber, you have been subpoenaed to testify here today; is that correct?
    A: Yes.
    Q: Do you know you are going to be asked questions about amongst other things the Shelter Island contract; is that correct?
    A: Yes.
    Q: And you have asserted your Fifth Amendment privilege; is that correct?
    A: Yes.
    Q: And Judge Mischler (sic) has signed an order compelling you to testify; is that correct?
    A: Yes.
    Q: And you are compelled to testify and the order also provides that your testimony cannot be used against you; is that correct?
    A: Yes.

does not plead guilty to crimes charged. The Court observed that under the original indictment the element of punishment or retaliation found in *Pearce* and *Blackledge* are not present in the "give-and-take" of plea bargaining, so long as the accused is free to accept the prosecution's offer. *Bordenkircher,* 434 U.S. at 363, 98 S.Ct. at 667.

■ Defendants liken the situation in this case to that in *Thigpen, Blackledge,* and *Pearce* by characterizing the increase in severity of the charges as "post-trial" because it came after the first trial. This characterization is mistaken. The government sought an initial indictment on the perjury count after plea negotiations collapsed and during preparation for the second trial; its addition was discussed in those plea negotiations and defendant was fully informed of the true terms of the offer when he made his decision to plead not guilty. This was the same kind of "give-and-take" referred to in *Bordenkircher.* Further, addition of the perjury charge cannot be viewed as "post-trial" to the first trial since the perjury offense was committed during the conduct of the first trial. Although Hochreiter had the right during the first trial to take the stand and testify in his own behalf, he did not have the right to lie under oath. *See Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971).

### B. Stephen Schreiber's Testimony

Defendants further assert that the prosecution's questioning of Stephen Schreiber, a former vice-president of Lizza Industries, about his assertion of the privilege against self-incrimination was prejudicial error requiring reversal. Schreiber testified on direct examination that after he asserted his Fifth Amendment privilege at the first trial, he had subsequently been compelled to testify under a grant of use immunity. Defendants believe that by questioning Schreiber on his assertion of the privilege the prosecution improperly cast him in a guilty light and and—because of his relationship with the defendants—this questioning also made defendants appear to be guilty.

■ A prosecutor who uses the fact that a witness has invoked his Fifth Amendment privilege against self-incrimination to discredit that witness or to prejudice the defendant commits trial error. The Supreme Court has stated that a "conscious and flagrant attempt [by the government] to build its case out of inferences arising from [the] use of the testimonial privilege" constitutes prosecutorial misconduct and requires reversal. *Namet v. United States,* 373 U.S. 179, 186, 83 S.Ct. 1151, 1154, 10 L.Ed.2d 278 (1963). Thus, a government attorney that persisted in questioning a witness, notwithstanding the fact that the witness had refused to testify and claimed his privilege against self-incrimination a total of 20 times, creates an "atmosphere of guilt" impermissably prejudicing the defendant. *United States v. Coppola,* 479 F.2d 1153, 1159–61 (10th Cir. 1973). Reversible error may also exist when inferences from a witness's refusal to testify have "added critical weight to the prosecution's case in a form not subject to cross-examination...." *Namet,* 373 U.S. at 187, 83 S.Ct. at 1155.

■ Such error does not invariably result every time a witness claims his testimonial privilege or is questioned about such a claim. *See Namet,* 373 U.S. at 186, 83 S.Ct. at 1154. Several circuits have held that when a witness is to testify under a grant of use immunity, a prosecutor's questioning of a witness, if conducted in good faith and in a non-inflammatory fashion, regarding the circumstances of his testimony, does not constitute error. *See United States v. Peterson,* 549 F.2d 654, 658–59 (9th Cir.1977); *United States v. Dingle,* 546 F.2d 1378, 1381–84 (10th Cir.1976); *United States v. Quinn,* 543 F.2d 640, 649–50 (8th Cir.1976); *United States v. Crouch,* 528 F.2d 625, 632 (7th Cir.1976), *cert. denied,* 429 U.S. 900, 97 S.Ct. 266, 50 L.Ed.2d 184 (1976).

■ Under the circumstances here, it was not error for the government attorney

to question Schreiber with respect to his claim of the Fifth Amendment privilege against self-incrimination. The questions cannot be characterized as a "conscious and flagrant attempt" to bolster the case through use of inferences arising from the witness's claim of the testimonial privilege, *Namet,* 373 U.S. at 186, 83 S.Ct. at 1154, nor did the prosecuting attorney create an "atmosphere of guilt." He merely asked a series of four neutral questions so the jury would understand the circumstances under which the witness was testifying. The government did not comment on Schreiber's claim of privilege in its summation. Pursuant to his grant of immunity, Schreiber testified at length and was subject to full cross-examination by defendants' attorneys. There is, therefore, no fear that inferences from his claim of the privilege added critical weight to the prosecution's case in a manner not subject to cross-examination. *Id.* at 187, 83 S.Ct. at 1155. Finally, the trial judge instructed the jury that it was not to consider Schreiber's assertion of his privilege in any way against the defendants.[2]

█ There is always a fear of abuse or prejudice when the jury is informed of a witness's invocation of his privilege against self-incrimination. Admittedly, it is best, whenever possible, to avoid any mention of

it. But here we find that the government acted in good faith and the defendants were not prejudiced.

## C. Profits Subject to Forfeiture

█ Finally, we turn to the more controversial issue, that is, the district judge's conclusion that gross rather than net profits should be used to determine the amount to be forfeited under RICO § 1963(a)(1). This point was specifically left undecided by the Supreme Court in *Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 304 n. 3, 78 L.Ed.2d 17 (1983).[3]

Title 18 U.S.C. § 1962(a) (1982), which appellant Lizza was convicted of violating, makes it unlawful

for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Section 1962(c), of which appellant Hochreiter was convicted, states that it shall be unlawful

---

2. The Court's instructions were as follows:

> THE COURT: Before we proceed, I have been instructed to charge you with reference to Stephen Schreiber who you recall testified ... that he was granted use immunity.
> I signed an order that in effect compelled him to testify in this case.
> You heard the testimony from Stephen Schreiber that before he was given this immunity he asserted the Fifth Amendment privilege against self-incrimination.
> I am instructing you as a matter of law that you may not consider Mr. Schreiber's assertion of the privilege against these defendants, these defendants being Herbert Hochreiter or Lizza Industries, Inc.
> The fact that Mr. Schreiber asserted the privilege does not mean that he has done anything wrong.
> Innocent men always may assert the Fifth Amendment under our law.

3. The newly enacted Comprehensive Crime Control Act of 1984 adds a section to the RICO statute, § 1963(a)(3). This new section spells

out clearly that a defendant must forfeit any "proceeds ... obtained directly or indirectly" from the pattern of unlawful activity that makes up the racketeering charge. The legislative history to the section notes:

> In paragraph (3), the term "proceeds" has been used in lieu of the term "profits" in order to alleviate the unreasonable burden on the government of proving net profits. It should not be necessary for the prosecutor to prove what the defendant's overhead expenses were.

Senate Rep. No. 225 Comprehensive Crime Control Act of 1984, 98th Cong., 1st Sess., Pub.L. 98–473 at p. 199, *reprinted in* U.S.Code Cong. & Ad.News 3182 at p. 3382 (Nov. 1984) (footnote omitted).

As this new section was not in effect when these defendants committed their offense, we can draw from it no inferences, either in favor of or against the use of the gross profits formula for these defendants.

for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

Section 1963(a)(1) provides that a person convicted under § 1962 shall forfeit to the United States "any interest he has acquired or maintained in violation of section 1962...."

The Supreme Court held in *Russello* that "interest" within the meaning of § 1963(a)(1) was not restricted to an interest in an enterprise, but could also include proceeds and profits received as a result of activity proscribed by § 1962. In a footnote the Court recognized that it had left unresolved any ambiguity that might be inherent in the terms "profits" and "proceeds" and stated "[o]ur use of those terms is not intended to suggest a particular means of calculating the precise amount that is subject to RICO forfeiture in any given case." *Russello*, 104 S.Ct. at 304 n. 3.

■■■ Appellants argue that in this case the amount to be forfeited should be calculated on the basis of "net" profits. That is to say, they advocate a formula based on all of the money they acquired through the illegal contracts less: (1) the direct costs from the contracts; (2) an allocated portion of the overall indirect operating expenses; and (3) the taxes paid on the profits. Appellants claim that any calculation that fails to subtract overhead expenses and taxes unfairly violates the holding of *United States v. Huber*, 603 F.2d 387 (2d Cir. 1979), which states that in RICO forfeiture cases, the punishment must "at least in some rough way [be] proportional to the crime." *Id.* at 397. The district court calculated the forfeiture by deducting from the money received on the illegal contracts *only* the direct costs incurred in performing those contracts. This method of computing a forfeiture is consistent with the purposes of the RICO statute.

■■■ As noted in *Russello*, "[t]he legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello*, 104 S.Ct. at 302. In fact, Congress instructed the courts that "[t]he provisions of this title shall be liberally construed to effectuate its remedial purposes." § 904(a) of Pub.L. 91–452, 84 Stat. 947. We have already recognized that RICO's forfeiture provision was intended as "a more potent weapon than fines or prison terms...." *United States v. Walsh*, 700 F.2d 846, 857 (2d Cir.1983), *cert. denied*, 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983). Thus, an expansive reading of § 1963(a)(1) is warranted. In *United States v. Huber*, we cautioned that there may be circumstances under which a forfeiture sanction is so harsh as to violate the Eighth Amendment's prohibition against cruel and unusual punishment. Punishment best fits the crime when forfeiture—as it is in RICO—is keyed to the magnitude of a defendant's criminal enterprise. 603 F.2d at 397. Calculation of forfeiture based on gross rather than net profits from illegal activity does not destroy this rough proportionality.

■■■ Concededly, this method of calculation leaves open a possibility that defendants will be forfeiting profits that they would have made outside of their criminal activities. This should not cause us to scuttle the method of computing forfeiture. Forfeiture under RICO is a punitive, not a restitutive, measure. Often proof of overhead expenses and the like is subject to bookkeeping conjecture and is therefore speculative. RICO does not require the prosecution to prove or the trial court to resolve complex computations, so as to ensure that a convicted racketeer is not deprived of a single farthing more than his criminal acts produced. RICO's object is to prevent the practice of racketeering, not to make the punishment so slight that the economic risk of being caught is worth the potential gain. Using net profits as the measure for forfeiture could tip such busi-

ness decisions in favor of illegal conduct. *Cf. United States v. Walsh,* 700 F.2d at 857 (forfeiture of a defendant's stock ownership in a corporate enterprise under § 1963(a)(2) applies to the defendant's entire ownership interest even when only part of the company's business was shown to be illegitimate).

Accordingly, the judgments appealed from are affirmed. The mandate of the Court shall issue forthwith.

VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:

Although I agree in the main with the holding of the majority, I am troubled by the apparent failure of the district court to consider how RICO's forfeiture provisions mesh with the Government's tax laws. It seems to me that we lose sight of RICO's basic purpose when we require a RICO defendant to forfeit to the Government that portion of the defendant's unlawfully acquired profits which the Government already has taken by taxing the defendant's income.

The question whether the proceeds of illegal activity must still be in existence in order to be subject to forfeit, while once a matter of some uncertainty, *see, e.g., United States v. Alexander,* 741 F.2d 962, 966–68 (7th Cir.1984), is now generally answered in the negative, *United States v. Ginsburg,* 773 F.2d 798 (7th Cir.1985); *United States v. Conner,* 752 F.2d 566, 576–77 (11th Cir.1985). However, if RICO's goal is "to remove the profit from organized crime by separating the racketeer from his dishonest gains", *Russello v. United States,* 464 U.S. 16, 28, 104 S.Ct. 296, 303, 78 L.Ed.2d 17 (1983), the Treasury Department already has accomplished this in substantial part, and, as to that part, there is no need for the Government to do it again.

It is generally recognized by now that RICO forfeiture is not a form of in rem seizure but is instead a criminal penalty against the convicted defendant. *United States v. Huber,* 603 F.2d 387, 397 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United*

*States v. Conner, supra,* 752 F.2d at 576. As such, it must meet the same constitutional standards as do other forms of punishment. For example, it should not lay "an unequal hand on those who have committed intrinsically the same quality of offense." *McLaughlin v. Florida,* 379 U.S. 184, 194, 85 S.Ct. 283, 289, 13 L.Ed.2d 222 (1964) (quoting *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942)). An argument might be made that the hand which dips into a RICO defendant's purse a second time is heavier than one which dips but once. If we adhere to RICO's basic purpose, the separation of the racketeer from his dishonest gains, we can, as we should, avoid the constitutional issues of due process and equal protection that arise as a result of the Government's double-dipping in the instant case.

In my opinion, the defendants should have been given an opportunity to prove how much of their unlawfully acquired profits already had been taken from them by the Government.