**UNITED STATES of America**

v.

**Angelo MILICIA.**

**Crim. A. No. 90–00155–1.**

United States District Court, E.D. Pennsylvania.

July 2, 1991.

Joan L. Markman, Sonia C. Jaipaul, Philadelphia, Pa., for plaintiff.

John Rodgers Carroll, Peter W. Cooley, Carroll & Carroll, Philadelphia, Pa., for defendant.

## MEMORANDUM DECISION UNDER FED.R.CRIM.P. 23(C) TRIAL WITHOUT JURY

LUDWIG, District Judge.

On August 20, 1990 defendant Angelo Milicia, a pharmacist, pleaded guilty to 16 counts of a 17–count superseding indictment charging conspiracy, possession with intent to distribute and distribution of controlled substances, filing false tax returns, and aiding and abetting. 21 U.S.C. §§ 846, 841(a)(1), 26 U.S.C. § 7206(1), 18 U.S.C. § 2. As to count 13, claiming forfeiture of drug offense related-property and proceeds, 21 U.S.C. § 853,[1] he admitted owing some

---

1. In part, the Comprehensive Forfeiture Act of 1984, also known as the Comprehensive Crime Control Act (amending the Comprehensive Drug Abuse Prevention & Control Act of 1970), provides:

$100,000, but denied responsibility for the amount sought by the government—$4,074,208.60. That amount represents the total sales of prescription medicine alleged to be includable in count one, the conspiracy, beginning November, 1984.[2] On October 4 and 5, 1990 a bench trial was held to determine "the extent of the interest or property subject to forfeiture, if any." Fed.R.Crim.P. 31(e).

### I.

The following facts are undisputed:[3]

During the more than five-year period of the conspiracy—from April, 1982 to August, 1987—Mr. Milicia, a licensed pharmacist in Pennsylvania, owned and operated a pharmacy at 1500 South Broad Street, Philadelphia. He worked in the pharmacy and at times employed another pharmacist and two assistants to fill prescriptions. These employees also pleaded guilty to illegal distribution of controlled substances. A fourth employee, hired in 1987, was not charged.

Almost all of the prescriptions dispensed were for name-brand medications: Tuinal, Ritalin, Preludin, Doriden, Empirin # 4, Talwin, Valium, Tussionex, Bromanyl, and Ambenyl. The prescription number, patient name and address, drug name, dosage units, physician, retail price, and the pharmacist's initials were entered into the pharmacy's computer.[4] The computer made labels for each prescription, a receipt, and a hard copy record of daily sales. The hard copy record was retained in monthly binders. The computer's memory has an inception date of January 6, 1986.

Five physicians wrote most of the prescriptions.[5] All were licensed practitioners whose illegal prescription writing had not yet been made public.[6] Also, as of August,

---

Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of state law—

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

(2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation;

. . . . .

The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed ... that the person forfeit to the United States all property described in this subsection. In lieu of a fine otherwise authorized by this part, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds.

21 U.S.C. § 853(a).

**2.** The effective date of the forfeiture liability statute is October 12, 1984.

**3.** Abbreviated references are as follows: fact stipulation, gov't exh. 65, (Stip.); defendant's admissions concerning forfeitable property, Oct. 12, 1990, (def. admissions); Oct. 4, 1990 trial transcript (Oct. 4 Tr.); Oct. 5, 1990 trial transcript (Tr.); Aug. 17, 1990 statement of Angelo Milicia (Milicia statement).

**4.** With the exception of certain undated prescriptions written by one doctor, all contained the name and address of the patient, and the

name, address and DEA number of the physician and, as such, complied with 21 C.F.R. § 1306.04(a).

**5.** They were George Johnson, Alphonse Willard, J. Pius Barbour, Hiroshi Suzuki, and William Burch. On July 24 and 26, 1990, respectively, William Burch and Hiroshi Suzuki pleaded guilty to conspiracy to dispense and dispensing controlled substances by writing illegal prescriptions. 21 U.S.C. §§ 841(a)(1) and 846. On January 22, 1990 DEA revoked George Johnson's certificate of registration for prescribing controlled substances outside the scope of professional practice and for other than legitimate purposes. Stip. ¶¶ 12–14. The record does not disclose whether Johnson, Willard and Barbour were charged with illegal dispensing practices.

**6.** In addition, illegal prescriptions from the following physicians were filled by the pharmacy from 1982 until narcotics charges were filed against them:

—Harold Galena, convicted October 29, 1986 for writing illegal prescriptions. 21 U.S.C. § 841(a)(1).

—Dante Bevilacqua, convicted December 3, 1987 for conspiracy to dispense and dispensing controlled substances by writing illegal prescriptions. 21 U.S.C. §§ 841(a)(1) and 846.

—Robert Blumberg, convicted January 11, 1988 for conspiracy to dispense and dispensing controlled substances by writing illegal prescriptions. 21 U.S.C. §§ 841(a)(1) and 846.

Illegal prescriptions from the following were also filled by the pharmacy:

—Samuel Perlman pleaded guilty to violating the Medical Practices Act of Pennsylvania, 63

1987 pharmacies were not required to obtain customer identification or to maintain a profile based on a customer's prescription history.

From 1982 to 1987, Milicia Pharmacy purchased all of its supply of controlled substances from West Wholesale Drug Company. In turn, West maintained monthly summaries of the quantities ordered and retained microfiche copies of invoices of the cost of the items sold.

In September, 1986 DEA conducted an accountability audit of the pharmacy. On May 13, 1987, at an administrative hearing, Mr. Milicia was advised of various violations[7] and was given a memorandum of understanding as to the "corresponding responsibility" requirement of 21 C.F.R. § 1306.04(a),[8] which he signed and returned on June 8, 1987.

Shortly before August 7, 1987, the pharmacy sold a government informant 2,000 Doriden and 2,000 Empirin # 4 tablets for $5,000. On that date, DEA agents, pursuant to a warrant, searched the pharmacy and seized:

—Computer-generated daily logs of prescription sales from January, 1986 through August, 1987. Gov't exh. 11–30; stip. ¶ 2.

—Written prescriptions filled by the pharmacy from December, 1985 through August, 1987. Gov't exh. 32–44; stip. ¶ 4.

—A handwritten journal used to record bulk sales of controlled substances to regular customers.[9]

—Several large brown paper bags filled with controlled substances.

—Several boxes of vials of pre-counted controlled substances.

—Several packets of unfilled prescriptions for controlled substances written by four of the five regular prescription writers.

—The pharmacy's computer, with memory back to January, 1986.

Defendant concedes that most prescriptions filled after his DEA hearing on May 13, 1987 were not for legitimate medical purposes. This is his basis for admitting liability for about $100,000. Def. admissions ¶ 2.

The government's contention is that the forfeiture period runs from November, 1984 to August 7, 1987. The pharmacy's total retail sales for drugs included in the superseding indictment[10] were $122,803.42

---

P.S. § 401, *et seq.* (Purdon 1968 & Supp.1990), by distributing prescriptions outside the regular course of medical practice. Prescriptions written by him were filled by the pharmacy from 1982 to 1987.

—Ronald Andrews was convicted June 30, 1982 of conspiracy to dispense controlled substances by writing illegal prescriptions. 21 U.S.C. § 846. Prescriptions written by him were filled by the pharmacy through December 31, 1982.

Stip. ¶¶ 7–11.

7. These violations involved failures to comply with the following DEA requirements: Maintaining an adequate prescription record for schedule II controlled substances; obtaining a written prescription within 72 hours of an emergency-call prescription; limiting an emergency authorization to an amount adequate to treat the patient during the emergency period; and completing an official DEA order form for a prescription dispensed to a physician for office use.

8. A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner

acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is *not a prescription within the meaning and intent of Section 309 of the Act* (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances. 21 C.F.R. § 1306.04(a).

9. "Regular customers" were ones who presented multiple prescriptions written in the names of different patients once a week or more. Gov't exh. 31; stip. ¶ 3.

10. The government did not include in its calculations and does not seek forfeiture as to the sales of Desoxyn listed in count I of the superseding indictment.

in November and December, 1984,[11] $945,-299.91 in 1985, and $3,458,795.31 from January, 1986 to August 7, 1987—a total of $4,526,898.64.

## II.

The following facts are found from the evidence:

According to a DEA accountability study made in September, 1983 for the period January–October, 1982, Milicia Pharmacy filled an average of 162 prescriptions per day.[12] Of these, 130 (82.5 percent) were written by one doctor. Moreover, of the Talwin prescriptions, 99.5 percent filled in April, 1982 and 99 percent filled in July, 1982 were from the same physician. Stip. ¶ 19.

In 1986 and 1987, the five regular prescription writers invariably directed 1) the maximum dosage level, 2) the same quantity of medication, and 3) in most instances, brand name medicine rather than generic equivalents. Tr. 80–82, 120, 162. Some often prescribed Doriden and Empirin # 4 for the same individual. Tr. 81, 159. This combination would induce sleep in anyone other than an addicted person who had developed a high tolerance for such drugs. Tr. 81. The pharmacy sold about the same number of controlled cough syrups in the summer-time as the winter. Tr. 79.

As early as February, 1985, pharmacy employees began pre-counting pills and pre-filling cough syrup bottles to expedite anticipated orders. Tr. 166–68; gov't exh. 52. One employee was hired in June, 1987 primarily to fill vials and bottles with Empirin # 4, Doriden, Talwin, Valium and Tuinal tablets and Tussionex and Bromanyl cough syrup. Her instructions from Mr. Milicia, among others, were to prepare specified amounts before the prescriptions were received by the pharmacy. Stip. ¶ 16. When time did not permit pre-counting, pharmacy employees gave out prescription medicine in pre-packed factory containers. Tr. 121. They often used brown grocery bags. Tr. 121, 195; gov't exh. 54–56, 58–60, 62.

Mr. Milicia was contemporaneously aware that all of the prescription filling practices charged in the indictment, from 1982 to 1987, were criminal and that the sales involved were illegal. Milicia statement. At the DEA administrative hearing on May 13, 1987, he admitted being familiar with 21 C.F.R. 1306.04(a). Tr. 226–28.

The pharmacy's regular drug customers numbered five to 10 in 1982 and 20 to 25 by 1987. Tr. 118, 128. In 1982, regular customers brought in five to 15 prescriptions at a time, written for different patients. By 1987, some regular customers were bringing in hundreds of prescriptions at a time. Tr. 118, 195–96. Although some credit was extended, all of these prescriptions were eventually paid for in cash. Tr. 79, 120.

From June 22, 1987 to August 7, 1987, at Mr. Milicia's direction, pharmacy employees maintained a handwritten journal of sales to regular customers. This journal recorded the customer's name, the amount of money that each owed and the amount paid, as well as the date of each transaction. These amounts ranged from several hundred dollars to over $10,000. Stip. ¶ 3; tr. 122, 172–73; gov't exh. 31, 65 ¶ 3. The journal contains 198 entries, totaling over $320,000. Gov't exh. 3; def. admissions ¶ 3.

The pharmacy did not keep records of prescription sales prior to January, 1986 either hard copy or in the computer. The available records of sales before January, 1986 are those of West Wholesale Drug Company; prescriptions filled during the latter part of 1985; and 1982 schedule II controlled substance prescriptions obtained in the 1983 DEA audit. Oct. 4 tr. at 36, 51–

---

**11.** The government estimated sales for November and December of 1984 by dividing the year's proceeds by 12 and multiplying by two. Defendant does not object to this method of calculation. *See* def. findings.

**12.** Defendant contends that this study is inadmissible because it encompasses the first three months of 1982, an uncharged period some eight years before trial. However, such evidence shows that these activities were not of recent origin or an infrequent event. It is relevant to show the existence of a similar pattern of controlled substance transactions in subsequent years. Fed.R.Evid. 401. Its probative value is not outweighed by the danger of unfair prejudice. Fed.R.Evid. 403.

52. As one employee testified, prescription sales to regular customers from 1982 to 1985 conformed with those from December, 1985 through August, 1987. They were identical as to brand names, dosages, regular customers, and cash payments—the same modis operandi. Tr. 116–120, 126–27, 130–32.

During the search conducted on August 7, 1987, Mr. Milicia was told by DEA agents that the pharmacy was not required to stop dispensing controlled substances. However, after that date, the pharmacy purchased very small quantities of prescription drugs and ceased ordering Doriden and Empirin # 4. Tr. 4–5.

The sales to its largest regular drug customers between June 22, 1987 and August 7, 1987, as recorded in its journal, represent over 80 percent of the pharmacy's total cash sales during that period. The recorded sales do not include smaller sales of controlled substances. Oct. 4 tr. 38; tr. 159–60; gov't exh. 28, 29, 31.

Prescriptions from the five physicians accounted for over 90 percent of the total filled from January, 1986 to August 7, 1987 and for over 91 percent of pharmacy revenue from prescription sales from June, 1986 to August, 1987. Tr. 79, 82–83; gov't exh. 66, 67.

According to DEA compiled data, for the years 1984 through 1987, this neighborhood pharmacy, located in South Philadelphia, ranked in the top 10 in the United States in wholesale purchases of a variety of name brand drugs. For example, in 1985 and 1986, it ranked first as to hydrocodone (Tussionex); in 1986 and 1987,[13] second as to secobarbital (Tuinal); in 1987, third as to codeine (Empirin # 4, Bromanyl, Ambenyl).[14] Gov't motion in limine, Oct. 22, 1990.

### III.

### A.

■ Our Circuit has held that the government's burden of proof in a criminal forfeiture action is by a preponderance.

[W]e uphold against constitutional challenge [21 U.S.C. § 853(d)'s] provision establishing a preponderance of the evidence as the government's burden of proof for criminal forfeiture after a guilty verdict.

. . . . .

Unquestionably, the burden of proof beyond a reasonable doubt applies to the elements of a criminal offense and is constitutionally mandated.... [H]owever, forfeiture is punishment for the crime. Forfeiture is not an element of the ... offense, but simply an additional penalty for that proscribed conduct.

The argument that forfeiture is an element which must be proved beyond a reasonable doubt confuses culpability with consequences. Section 853(a) expressly says that "[t]he court, in imposing sentence ... shall order, in addition to any other sentence ... that the person forfeit ... all property described in this subsection." The statute, in effect, characterizes forfeiture as punishment for the crime and not part of the offense itself.

. . . . .

The legislative history makes clear that Congress sought to make the government's burden of proof in criminal forfeitures the same as that in the civil realm.

*United States v. Sandini*, 816 F.2d 869, 870, 875–76 (3d Cir.1987). *See also United States v. Pace*, 898 F.2d 1218, 1235 n. 5 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990); *United States v. Hernandez–Escarsega*, 886 F.2d 1560, 1576–77 (9th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990). *But see United States v. Elgersma*, 929 F.2d 1538, 1542–49 (11th Cir.1991) (reasonable doubt); *United States v. Pryba*, 674 F.Supp. 1518, 1519–21 (E.D.Va.1987) (same).

---

**13.** The pharmacy stopped making purchases of secobarbital and codeine in August, 1987.

**14.** In 1985, there were 57,641 purchasers of hydrocodone in the United States; in 1986, 25,368 of secobarbital; in 1987, 62,086 of codeine.

## B.

The government would apply the presumption of § 853(d) to the pharmacy's gross sales during the entire forfeiture period.[15] Defendant contends that § 853(d) is limited to tangible assets that are not traceable to specific drug transactions. He argues that it does not apply where the revenue source is clear and the issue is the amount of profit derived from illegal sales. Def. trial mem. 9–11; def. findings 12–13.

Since defendant concedes that forfeiture liability attaches to transactions that he knew were illegal, *see* def. admissions, it is unnecessary to decide whether the presumption is applicable. The issue to be resolved is the extent of forfeiture liability. The statute includes forfeiture of monetary receipts. 21 U.S.C. § 853(a), (b).[16]

## C.

Defendant's opposition to forfeiture liability based on his lack of guilty knowledge is untenable. He claims to have been unaware of the requirements of 21 C.F.R. 1306.04(a) before the DEA administrative hearing on May 13, 1987. Def. findings at 15. His guilty plea and the fulsome, detailed evidentiary record are to the contrary. *See, e.g.,* tr. 226–28 (at the DEA hearing, he admitted being familiar with the regulations).

 Regardless, in a forfeiture proceeding a defendant's specific knowledge of the law or regulations at issue need not be shown. *See, e.g., Liparota v. United States,* 471 U.S. 419, 433–34, 105 S.Ct. 2084, 2092–93, 85 L.Ed.2d 434 (1985) (in prosecution for food stamp fraud, government must prove defendant knew acquisition or possession of food stamps was unauthorized; it need not prove knowledge of food stamp regulations or defendant's guilty state of mind). As to a pharmacist, the government may meet its burden by demonstrating deliberate disregard of clear evidence that the prescriptions were not issued for a legitimate medical purpose or in the usual course of medical treatment.

> The question ... in any case where a pharmacist is charged with illegal distribution of controlled substances, is whether he knew that the purported prescription was not issued for a legitimate medical purpose or in the usual course of medical practice.... The key element of knowledge may be shown by proof that the defendant deliberately closed his eyes to the true nature of the prescription.

*United States v. Lawson,* 682 F.2d 480, 482 (4th Cir.), *cert. denied,* 459 U.S. 991, 103 S.Ct. 348, 74 L.Ed.2d 387 (1982).[17]

Here, Mr. Milicia did more than merely close his eyes. He admitted that during the entire period of the conspiracy—from 1982 to 1987—drugs "were dispensed in clearly illegal ways; i.e. under circumstances in which I knew and I understood that the others knew that the drugs were not being dispensed for legitimate medical reasons and the sales were outside the course of usual [pharmaceutical] practice." Milicia statement.

Even if unfamiliar with the specific requirements of 21 C.F.R. § 1306.04(a) before

---

**15.** There is a rebuttable presumption at trial that any property of a person convicted of a felony under this subchapter or subchapter II of this chapter is subject to forfeiture under this section if the United States establishes by a preponderance of the evidence that—
 (1) such property was acquired by such person during the period of the violation ... or within a reasonable time after such period; and
 (2) there was no likely source for such property other than the violation....
21 U.S.C. § 853(d).

**16.** The statute defines property as:
 (1) real property, including things growing on, affixed to, and found in land; and

 (2) tangible and intangible personal property, including rights, privileges, interests, claims, and securities.
21 U.S.C. § 853(b).

**17.** *See also United States v. Seelig,* 622 F.2d 207, 213 (6th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980) (jury instruction that "knowledge may be inferred from proof that appellants deliberately closed their eyes to what would otherwise be obvious to them" upheld in case of pharmacists convicted of dispensing controlled substances in violation of 21 U.S.C. § 841(a)).

May 13, 1987, therefore, Mr. Milicia countenanced and was aware of the blatant trafficking in illegal prescriptions at his pharmacy that had continued to escalate since 1982.[18]

#### D.

■ Defendant contends that forfeiture liability before March 27, 1985 is barred by the general five-year statute of limitations.[19] 18 U.S.C. § 3282.[20] He asserts:

> Property is forfeitable under § 853 only to the extent it constitutes or is derived from proceeds obtained as a result of drug-related violations or to the extent the property was used to commit or facilitate the commission of the violation. 21 U.S.C. § 853(a)(1) and (2). A conspiracy consists only of an unlawful agreement made with the requisite intent to commit the underlying substantive offense.... Simply put, no property can be obtained or used to form an unlawful agreement. No proceeds accrue except from actual sales. It follows that property is not forfeitable as a result of the commission of the crime of conspiracy, but only through the commission of substantive offenses of illegal sales of drugs.
>
> Here, no pre-March 27, 1985 substantive drug violations are charged in the indictment ... thus there is no basis for forfeiture of property that was acquired, obtained or used to commit any offense that is beyond the five year statute of limitations.

Def. mem. 7–8.

Section 853 mandates forfeitures where there are "violation[s] of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year." 21 U.S.C. § 853(a). The drug conspiracy to which defendant pleaded guilty is a violation punishable by imprisonment for more than one year. Nothing in the statute suggests that forfeiture liability applies only to an actual sale of drugs or that proceeds or property growing out of a conspiracy are somehow immune. *See United States v. Lamon*, 930 F.2d 1183, 1193 (7th Cir.1991) ("Forfeiture can be based on a violation of either 21 U.S.C. § 846 (conspiracy) or 21 U.S.C. § 841(a)(1) (possession)"); *United States v. Vriner*, 921 F.2d 710, 712 (7th Cir.1991) (in making § 853 forfeiture determination, court relied on recent interpretation of "identical language in the civil forfeiture statute, 21 U.S.C. § 881(a)(7), as indicating a congressional intent 'to reach all real property used to promote the drug trade' ").

Here, the conspiracy persisted at least until the date of the DEA search of the pharmacy on August 7, 1987. As noted, the indictment was filed March 27, 1990, within the period of limitations. *See United States v. Heldon*, 479 F.Supp. 316, 319–20 (E.D.Pa.1979) (inasmuch as "21 U.S.C. § 846 does not require proof of any overt act to sustain a conviction thereunder ... the statute of limitations did not begin to run until the conspiracy actually terminated"); *United States v. Rouleau*, 894 F.2d 13, 14 (1st Cir.1990) ("The statute of limitations for an offense begins to run when the crime is complete"); *United States v. Butler*, 792 F.2d 1528, 1532 (11th Cir.), *cert. denied*, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986) ("[O]n a non-overt-act-conspiracy charge, the indictment satisfies the requirements of the statute of limitations if the government alleges and proves ... that the conspiracy continued into the limitations period").

---

**18.** When a pharmacist is faced with a large number of prescriptions all written by one doctor and all presented by one person, he has strong evidence that the prescriptions are not legitimate.... Further ... the uniform dosages and quantities belied any conclusion that the prescriptions in this case were ordered for individual patients.
*United States v. Lawson*, 682 F.2d at 482–83.

**19.** The indictment was filed March 27, 1990.

**20.** Except as otherwise expressly provided by law, no person shall be prosecuted, tried or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.
18 U.S.C. § 3282.
Inasmuch as 21 U.S.C. § 846 does not contain a statute of limitations provision, the general five-year statute applies.

For these reasons, proceeds directly or indirectly derived from or used to facilitate the commission of the conspiracy after October 12, 1984 [21] are held to be subject to forfeiture liability.

### E.

■ The government contends:

[A]t least 90% of the prescription drugs dispensed by Milicia Pharmacy during the time charged were dispensed outside the course of accepted pharmaceutical practice and for no legitimate medical purpose and, as such, constituted drug dealing. Because the proceeds of this drug dealing were obtained during the time of the violations of conviction and there was no likely source for these proceeds other than the drug violations, the proceeds are presumed to be forfeitable. 21 U.S.C. § 853(d).

Gov't mem. at 5. The government's forfeiture calculation of 90 percent of prescription drug sales is based on—

examin[ing] records of prescriptions filled by the pharmacy in 1986 and 1987 written by Dr. George Johnson, Dr. Hiroshi Suzuki, Dr. J. Pius Barbour, Dr. William Burch and Dr. Alphonse Willard from December, 1985 through August, 1987, for the drugs Tuinal, Ritalin, Preludin, Doriden, Empirin # 4, Talwin, Valium, Tussionex, Bromanyl, and Ambenyl.... These doctors' prescriptions for these drugs account for approximately 90% of all the prescriptions filled by the pharmacy during that time, and sales of the controlled substances to fill these prescriptions amounted to almost 92% of the pharmacy's total retail sales for that time.

Gov't mem. at 5.

Upon careful review, these calculations appear to be accurate. See section II, supra.

It is the government's position that ... the nature and extent of Milicia Pharmacy's unlawful distribution of controlled substances in 1986 and 1987 remained constant [from 1982 to 1987. According-

ly, the 90 percent] figure is extrapolated over the entire period of the conspiracy charged.

Gov't mem. at 6–7.

This calculation method, or projection, does not appear to have been employed in a § 853 or a RICO forfeiture proceeding. However, extrapolation and reconstruction of illegal or undisclosed income have been held to be proper in internal revenue cases where the taxpayer's lack of complete records makes precise accounting impossible. See, e.g., Adamson v. C.I.R., 745 F.2d 541, 548 (9th Cir.1984) ("[T]he taxpayer should not be allowed to avoid paying taxes simply because he keeps incomplete records"); Gerardo v. C.I.R., 552 F.2d 549, 552 n. 6 (3d Cir.1977) ("Since appellant kept no records ... 'it was proper and indeed necessary to devise some substitute method for reconstructing income.' ... Where unreported income from gambling is at issue, the projection of average daily gross income is an acceptable method of reconstruction"); Gordon v. C.I.R., 572 F.2d 193, 195 (9th Cir.1977), cert. denied, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 517 (1978) ("In light of the propriety of similar methodologies for generating the amount of unreported wager income by extrapolation ..." reconstruction of the amount of unreported income for preceding nine months from one day's wagers upheld). See also Jones v. C.I.R., 903 F.2d 1301 (10th Cir.1990) (income tax deficiency based on unearned income estimate of $33 million from drug sales upheld):

It is almost certain that the Commissioner's assessment of unreported income is inaccurate. The inaccuracy results, however, not from uncertainty concerning [appellant's] significant involvement in this massive drug scheme, but from his failure to maintain any records whatsoever reflecting drug related income, and his refusal to even suggest a more accurate amount or more reasonable basis to compute his income. There is simply too much evidence supporting the government's assessment of enormous income derived from illegal sources

---

**21.** See footnote 2, supra.

to sustain [appellant's] attack which is in turn totally devoid of any evidentiary foundation.

*Jones,* 903 F.2d at 1303–06.[22]

Awards of approximated reimbursement, restitution, and damages have also been upheld as reasonable as long as the underlying assumptions rested on adequate data. *See, e.g., Story Parchment Co. v. Paterson Parchment Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931):

> [W]hile the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.... [T]he risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party.[23]

The incompleteness of Milicia Pharmacy records and the volume of prescriptions involved make the precise calculation of forfeiture liability impracticable. Nonetheless, the government's projections have a substantial evidentiary foundation. Illegal sales from November, 1984 to January, 1986 may be closely approximated from those established for 1986 and 1987. On this basis, a minimum of 90 percent of the prescriptions dispensed between November, 1984 and August 7, 1987 were not for a legitimate medical purpose and were outside the course of accepted pharmaceutical practice. Using a 90 percent formula, total receipts for illegal prescriptions comes to $4,074,208.78.[24]

### F.

Defendant asserts—

The term "proceeds" used in 21 U.S.C. § 853(a) means at most adjusted gross proceeds, i.e., the profits or returns from a sale after direct costs are deducted. Certain direct costs associated with conducting Milicia Pharmacy's business must be deducted from the gross receipts to determine the amount of proceeds forfeitable under 21 U.S.C. § 853. These direct costs include the costs of goods sold, payroll and taxes paid by Milicia.

Def. findings at 8.

The government counters that the distinction between gross and net proceeds posited by defendant is not made in the statute. However, some clarification may be found in RICO. In an almost identical provision in 18 U.S.C. § 1963(a)(3),[25] Congress directed the forfeiture of "proceeds" instead of "profits" in order to ease the

---

22. As mentioned, defendant concedes liability for about $100,000. *See* def. admissions. However, this figure is limited to sales recorded in the pharmacy's journal between June 22, 1987 and August 7, 1987, less cost of goods sold, payroll and income tax. Given the record in this case, defendant's calculation is considered to be a "refusal to even suggest a more accurate amount or more reasonable basis to compute his income." *Jones,* 903 F.2d at 1305–06.

23. *See also J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1539 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) ("The plaintiff's proof of damages is facilitated by the rule that once the plaintiff has met its burden of proving the fact of damage, some uncertainty with respect to the amount of damages will not preclude recovery"); *United States v. Hand,* 863 F.2d 1100, 1104 (3d Cir.1988) ("Difficulties of measurement do not preclude the court from ordering a defendant to compensate the victim through some restitution").

24. The pharmacy's total retail sales for this period were $4,526,898.64. *See* section I, *supra.* $4,526,898.64 × .90 = $4,074,208.78.

25. (a) Whoever violates any provision of section 1962 of this chapter ... shall forfeit to the United States, irrespective of any provision of State law—

. . . . .

(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

. . . . .

(b) Property subject to forfeiture under this section includes—
(1) real property, including things growing on, affixed to, and found in land; and
(2) tangible and intangible personal property, including rights, privileges, interests, claims and securities.
18 U.S.C. § 1963.

government's otherwise problematical burden of establishing forfeitable assets.

In paragraph (3), the term "proceeds" has been used in lieu of the term "profits" in order to alleviate the unreasonable burden on the government of proving net profits. It should not be necessary for the prosecutor to prove what the defendant's overhead expenses were.

S.Rep.No. 225, 98th Cong., 2d Sess., 199 (1984), reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3382.[26]

Also, as the government points out, it is entitled to forfeiture of § 853(a)(2) facilitation property. *See* superseding indictment, count 13. Mr. Milicia, the government contends, is no more entitled to a credit for moneys paid his vendor or his employees than a cocaine dealer is entitled to payments to his supplier or for any other costs of doing business. The amounts used to acquire controlled substances, salaries paid to pharmacy employees and income taxes paid "were used, or intended to be used, in [some] manner or part, to commit, or to facilitate the commission of"[27] the drug conspiracy.

Whether cost of goods sold, payroll, taxes or other business expenses are to be deducted under § 853 or RICO has not received much decisional fine tuning.

In our ruling today, we recognize that we have not resolved any ambiguity that might be inherent in the terms 'profits' and 'proceeds.' Our use of those terms is not intended to suggest a particular means of calculating the precise amount that is subject to RICO forfeiture in any given case.

*Russello v. United States,* 464 U.S. 16, 29 n. 3, 104 S.Ct. 296, 304 n. 3, 78 L.Ed.2d 17 (1983). *See also United States v. Ofchinick,* 883 F.2d 1172, 1182 (3d Cir.1989) ("The issue of the extent to which direct costs may be deducted from racketeering profits

is not free from doubt").[28] However, three courts have reached similar conclusions.

In *United States v. Masters,* 924 F.2d 1362, 1369–70 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991) (citation omitted), the court stated:

The [RICO forfeiture] statute is designed to force criminals to disgorge their ill-gotten gains. We may assume, therefore, as intimated in *Russello v. United States,* that the proceeds to which the statute refers are net, not gross, revenues—profits, not sales, for only the former are gains.

In *United States v. Lizza Industries, Inc.,* 775 F.2d 492, 497 (2d Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986), "the district court's conclusion that gross rather than net profits should be used to determine the amount to be forfeited under RICO § 1963(a)(1)" was upheld. The "gross profits" calculation was made by deducting the direct costs incurred in performing illegal contracts.

Appellants argue that in this case the amount to be forfeited should be calculated on the basis of "net" profits. That is to say, they advocate a formula based on all of the money they acquired through the illegal contracts less: (1) the direct costs of the contracts; (2) an allocated portion of the overall indirect operating expenses; and (3) the taxes paid on the profits.... The district court calculated the forfeiture by deducting from the money received on the illegal contracts *only* the direct costs incurred in performing those contracts. This method of computing a forfeiture is consistent with the purposes of the RICO statute.

*Lizza Industries,* 775 F.2d at 498 (emphasis in original).

---

26. "Congress ... indicated that courts interpreting section 853 could look ... to the RICO forfeiture statute ... for guidance." Note, *Real Property Forfeiture,* 137 U.Pa.L.Rev. 303, 316–17 (1988) (footnote omitted).

27. 21 U.S.C. § 853(a)(2).

28. The statutes' sole references to a distinction between gross/net profits or proceeds are the following: "In lieu of a fine otherwise authorized by this [section or part], a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds." 18 U.S.C. § 1963(a); 21 U.S.C. § 853(a).

In *United States v. Elliott,* 727 F.Supp. 1126, 1128 (N.D.Ill.1989), an insider trading prosecution, the government computed the proceeds by subtracting the purchase price of the stock from the sales price. Defendant contended that from the government's figure, "three items should be deducted in determining the amount of proceeds: (1) the commissions paid to [the broker] on the stock transactions; (2) the interest charged by [the broker] on the margin loan used to purchase the securities; and (3) the income tax paid to the United States with respect to each of the transactions." *Elliott,* 727 F.Supp. at 1128. Both the government and defendant agreed that "while direct costs should be deducted from the amount of proceeds, overhead or indirect costs should not be." *Elliott,* 727 F.Supp. at 1129. They disagreed as to what are direct and overhead costs. Acknowledging § 1963's ambiguity[29] and "the issue [to be] a close one," the court concluded that commissions and interest are more akin to direct costs than to overhead expenses. *Elliott,* 727 F.Supp. at 1129.

Overhead is defined as "[a]ny cost not specifically or directly associated with the production of identifiable goods and services," *Black's Law Dictionary* 995 (5th ed. 1979), and the commissions and interest do not fit into this definition. Rather, they were costs specifically associated with the money that Elliott made;

indeed, Elliott could not have made the money he did without paying the commission and interest fees. Moreover, the commission and interest were money that Elliott never received.... Accordingly, we conclude that the amount of commissions and interest should not be included in the proceeds that Elliott must forfeit.

*Elliott,* 727 F.Supp. at 1129.[30]

■ The government's calculation of "proceeds" is based on the pharmacy's total illegal retail sales during the forfeiture period—i.e., gross receipts—without any reduction. However, at no time did the pharmacy's gross receipts exist as a totality. A significant portion—representing cost of goods sold—was continually put back into inventory. The amount of money claimed to be forfeitable by the government is an aggregate or total of a revolving fund of gross profits plus cost of goods sold. The gross profits are held to be forfeitable, but not the cost of goods sold.

The government's contention that the gross receipts are forfeitable as facilitation property is faulty for similar reasons. If money used to purchase drugs is analogized to a tangible object or objects, such as a car or house, the anomalous legal and practical result becomes readily apparent. Forfeiture of a single, discrete object or sum of money as facilitation property is

---

**29.** "While we would agree that 'proceeds' is more inclusive than 'profits,' we do not think that the meaning of 'proceeds' is plain.... [T]he statute [§ 1963] is not clear on its face." *Elliott,* 727 F.Supp. at 1128.

**30.** *See also United States v. Alexander,* 1990 WL 117882 (D.Minn. August 10, 1990), where the court, without explicitly discussing the deduction of direct expenses, determined that the forfeiture of gross profits was proper under § 1963. In that case, defendant was charged with selling and interstate transportation of obscene materials. The government sought forfeiture of "bank accounts, all funds credited to and traceable from the accounts, and all safe deposit boxes associated with the business entities in which the jury determined defendant had an interest...." *Alexander,* 1990 WL 117882 at 4. The government also sought forfeiture of $8,910,548.10 as proceeds of the racketeering activity. *Alexander,* 1990 WL 117882 at 4.

The broad extent of the government's request in this area of forfeiture poses a serious question of the relationship between the dollars generated in the sale or distribution of the videos and magazines declared obscene, and that portion of defendant's enterprises which were not obscene and were, perforce, not illegal. Plainly, there is little chance that the sale of these few videos and magazines could generate such massive income to the enterprise.

. . . . .

The determination of the amount of profits and proceeds of the racketeering activity cannot be precise. Courts, however, have concluded gross profits are at least one acceptable measure of proceeds. *United States v. Lizza Industries,* 775 F.2d 492, 498 (2d Cir. 1985).... Although this method poses potential difficulties in dividing moneys derived from the enterprise from those obtained independently, this concern alone will not undermine use of the gross profits figure.

*Alexander,* 1990 WL 117882 at 4–5.

proper. Here, however, the government would have multiple forfeitures of the same property. This result goes beyond the dictates of the statute. Under the government's view there could be a forfeiture of both the tangible object—the car or house—and the money used to acquire it.[31] The purpose of Congress was to give the prosecutor the ability to destroy a drug dealer's power base. *See, e.g., Russello*, 464 U.S. at 28, 104 S.Ct. at 303. Lacking a clear expression of statutory intent, this objective would not necessitate or justify the repeated forfeiture of the same property.[32]

Given this analysis, the wholesale cost of the prescriptions must be deducted from the pharmacy's forfeitable gross revenues. Using the pharmacy's mark-up of 67 percent, that cost was 60 percent of gross receipts.[33] For the period from November, 1984 to August, 1987, gross profit on illegal prescriptions was $1,629,683.68.[34]

■ Deductions for payroll expenses and defendant's business or personal income taxes will not be allowed. There are two sets of reasons. First, in a forfeiture proceeding, the production burden of obtaining a deduction is on the defendant.

If direct costs need be taken into account, it is the defendant who has the burden of going forward on this issue (if not the burden of proof, an issue we do not reach). The government should not have to prove the absence of direct costs in a case in which the defendant has not pointed to costs that might be deductible. *Ofchinick*, 883 F.2d at 1182.

Substantial amounts of payroll and taxes must be attributable to the pharmacy's illegal prescription business. However, defendant has not connected these expenditures to specific sales or to the pharmacy's overall gross receipts, which included non-prescription items. There is, therefore, an accounting difficulty in allocating salary expense and taxes between legal and illegal business activity.[35] *See Lizza Industries*, 775 F.2d at 495 ("[D]efendants could deduct direct costs incurred on each project for which they had been indicted, but could not deduct general overhead and business expenses that otherwise would have been incurred in the operation of their business"). *See also Elliott*, 727 F.Supp. at 1129.

Moreover, Mr. Milicia pleaded guilty to filing false income tax returns for the years 1986 and 1987. 26 U.S.C. § 7206(1). On the forfeiture count, as proof of the pharmacy's expenses, he submitted his 1985, 1986 and 1987 tax returns. *See* def. exh. 1. In his guilty plea, he admitted that gross sales for 1986 and 1987 "were sub-

**31.** An example in the case of drug trafficking: If a defendant is arrested on the way to a drug deal, money intended to be used to buy drugs is, of course, forfeitable as facilitation property. If arrested after the purchase, drugs or profits in defendant's possession are forfeitable as facilitation property or proceeds. However, in neither instance would forfeiture from the same defendant of both the purchase money and the drugs be justifiable. To the extent that these two amounts represent the same asset, they are duplicative. That RICO requires the forfeiture of "the total amount of the proceeds of [defendant's] racketeering activity, regardless of whether the specific dollars received from that activity are still in his possession," *United States v. Ginsburg*, 773 F.2d 798, 802 (7th Cir.1985), cert. denied, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986), is not to the contrary. In that case, profits were spent on luxury items and indirect expenses.

**32.** Whether the forfeiture of gross receipts in these circumstances would be constitutionally improper is not considered.

**33.** The government agrees that the cost of goods sold is approximately 60 percent of gross sales. *See* gov't response to def. findings at 2 ("The record supports a finding that between January 1, 1986 and August 7, 1987, Milicia marked up the charged controlled substances approximately 67%. The record also supports a finding that Milicia paid to West $2,072,849.50 to obtain the drugs he sold for $3,458,795.32 listed in Government Exhibit 71").

**34.** $4,074,208.78 (total receipts for illegal prescriptions) × .60 = $2,444,525.27 (cost of goods sold).

$4,074,208.78 − 2,444,525.27 = $1,629,683.68 (gross profit).

**35.** This issue differs from the proportion of legal/illegal prescriptions in which a 90 percent ratio was projected. Here, the pharmacy's entire business activity is involved, and the relevant figures are not in the record.

stantially more than" reported in his returns.[36] His contention, based on these returns, that payroll expenses were about 10 percent of gross sales must, therefore, be rejected. Defendant's burden of going forward has not been met.

Secondly, aside from the accounting problem, it is doubtful whether operational expenses and income taxes should be deductible. Analogizing again to tangible property, maintenance and other items of expense incurred to preserve an asset do not involve acquisition cost. As such, they do not duplicate or overlap the value of the forfeitable assets. Under § 853, "proceeds" are not defined, and there are no allowable deductions enumerated. So viewed, the criminal perpetrator must pay the price of owning and maintaining illegally obtained property—or operating an illegal business.[37] In contrast to cost of goods sold, the calculation of operating expense has been determined by Congress to be overburdensome and unnecessary.[38]

Related factors apply to taxes.[39]

[W]e conclude that the money Elliott paid in taxes should not be deducted from the amount of proceeds. Elliott did receive this money, and had the use of it before he had to pay it over to the government. Moreover, the amount of taxes Elliott had to pay in the years in question depended in part on his other, legitimate income and on the other investments he made that affected his deductions and the like. Thus, taxes are more like overhead—which the legislative history indicates should not be deducted—than like a direct cost of the transaction.

*Elliott,* 727 F.Supp. at 1129.

## IV.

It is undisputed that the pharmacy's sales of all drugs between November, 1984 and August 7, 1987 amounted to $4,526,-898.64.[40] Ninety percent represents the unlawful distribution of controlled substances—$4,074,208.78. Subtraction of 60 percent for cost of goods sold leaves forfeitable gross profits of $1,629,683.68. The balance of the deductions claimed are disallowed.[41]

---

**36.** *See* superseding indictment, counts 14, 16.

**37.** Moreover, at least some of the moneys paid to employees allowed Mr. Milicia to be away from the pharmacy and to be involved in other activities. *See* def. admissions ¶ 1 ("The legality of defendant's [pre-May 13, 1987] conduct depends on the circumstances of those sales of which defendant is unaware, as most of them were made in his absence"). The nature of those pursuits is immaterial.

[A] racketeer who dissipates the profits or proceeds of his racketeering activity on wine, women, and song has profited from organized crime to the same extent as if he had put the money in his bank account. Every dollar that the racketeer derives from illicit activities and then spends on such items as food, entertainment, college tuition, and charity, is a dollar that should not have been available for him to spend for those purposes. In order to truly separate the racketeer from his dishonest gains, therefore, the statute requires him to forfeit to the United States the total amount of the proceeds of his racketeering activity, re-

gardless of whether the specific dollars received from that activity are still in his possession.

*Ginsburg,* 773 F.2d at 802.

The use of employees enabled Mr. Milicia to enjoy an absentee-owner life-style. Some of the salary expense "should not have been available for him to spend for those purposes." *Ginsburg,* 773 F.2d at 802.

**38.** *See* S.Rep.No. 225, 98th Cong., 2d Sess., 199 (1984), reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3382, quoted *supra* at 887.

**39.** Furthermore, defendant's 1985, 1986 and 1987 income tax returns show no payment of taxes during those years. *See* def. exh. 1. *See also* def. admissions ¶ 6 ("[W]e are unable to accurately prorate ... the taxes at this time").

**40.** *See* section I, undisputed facts, *supra.*

**41.** By order dated June 28, 1991 judgment was entered in favor of the United States of America and against defendant Angelo Milicia on count 13 of the superseding indictment in the amount $1,629,683.68.