11-610-cr (L)
United States v. Peters

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: December 21, 2012                    Decided: October 9, 2013)

Docket Nos. 11-610-cr(Lead) 11-612-cr(Con)

------------------------------------

UNITED STATES OF AMERICA,

*Appellee*,

- v -

FRANK E. PETERS,

*Defendant-Appellant*.

------------------------------------

Before:      SACK and LYNCH, *Circuit Judges*.[1]

---

[1] Judge Guido Calabresi, originally assigned to the panel, recused himself from this case shortly before oral argument.  The two remaining members of the panel, who are in agreement, have determined the matter in accordance with Second Circuit Internal Operating Procedure E(b).  *See* 28 U.S.C. § 46(d); *cf. United States v. Desimone*, 140 F.3d 457, 458 (2d Cir. 1998).

Appeal by the defendant, convicted of various counts related to a scheme to defraud a bank, from a judgment of the United States District Court for the Western District of New York (William M. Skretny, *Judge*) ordering forfeiture pursuant to 18 U.S.C. § 982(a)(2) in the amount of $23,154,259.  We conclude that (1) section 982 requires forfeiture of the gross receipts of the criminal violation, not only the profits, and (2) in light of his almost total control over the companies involved in the violation and their assets, the defendant "indirectly" obtained the proceeds of the fraud through the companies and can therefore be held accountable for criminal forfeiture of those proceeds pursuant to section 982.  We therefore affirm the forfeiture award by the district court.

Affirmed.

> JAMES W. GRABLE, Jr., Connors & Vilardo, LLP, Buffalo, NY, *for Defendant-Appellant*.
>
> JOSEPH J. KARASZEWSKI (Richard D. Kaufman and Gretchen L. Wylegala, *on the brief*), Assistant United States Attorneys *for* William J. Hochul, Jr., United States Attorney for the Western District of New York, Buffalo, NY, *for Appellee*.

SACK, *Circuit Judge*:

The defendant, Frank E. Peters, was charged in the United States District Court for the Western District of New York with various counts related to a scheme to defraud Chase Manhattan Bank ("Chase") by overvaluing assets used to secure and maintain a revolving line of credit. In addition to imposing a term of imprisonment and ordering restitution, the district court (William M. Skretny, *Judge*) ordered forfeiture in the amount of $23,154,259 pursuant to 18 U.S.C. § 982(a)(2). The district court concluded that section 982 requires forfeiture of the "receipts" of the criminal violation, i.e., "the draws from the revolving line of credit between July 1998 and October 2000." *United States v. Peters*, 257 F.R.D. 377, 388 (W.D.N.Y. 2009). The district court also concluded that although the loan proceeds were disbursed to corporations owned and controlled by Peters and his wife, because they were in fact his corporate alter egos, it would "pierce the corporate veil" and hold the defendant liable for the proceeds reaped by the corporations.

The defendant advances several arguments challenging his conviction and the loss amount calculated for Sentencing Guidelines and restitution purposes, all of which we resolve in a summary order filed today. In this precedential opinion we address only the defendant's challenge to the order

3

of forfeiture. The defendant objects to it on two grounds: (1) section 982 requires him to forfeit only the "profits" of the fraudulent scheme, not all payments that his companies received under the Chase loan, and (2) the district court erred when it "pierced the corporate veil" to find that he personally "obtained" the loan proceeds paid to his companies.

We conclude that (1) section 982 requires forfeiture of the gross receipts attributable to the criminal violation, not only the profits, and (2) in light of his near total control over the companies and their assets, the defendant "indirectly" obtained the Chase loan proceeds and can be held accountable for criminal forfeiture of those proceeds pursuant to section 982.

## BACKGROUND

Peters and his wife, Marta Chaikovska, purchased World Auto Parts, Inc. ("WAPI") in 1990. In 1995, WAPI acquired a company Peters and his wife renamed Bighorn Core, Ltd. ("Bighorn"). WAPI and Bighorn (together, the "Companies") sold aftermarket auto parts. Chaikovska was WAPI's chief executive officer and owned 85 percent of the Companies. Peters was the president and owned 13 percent. Peters's sister-in-law owned one percent, and a fourth individual, Peter Van Domelen, owned one percent.

4

*The Chase Loan*

In 1996, the Companies entered into an asset-based credit agreement with Chase in which the bank agreed to extend to the Companies a $9 million revolving line of credit secured by the Companies' assets. In June 1998, the parties renewed the agreement for two years, raising the available credit to $10.5 million. The cash available to the Companies on any given day was determined by the Companies' "borrowing base": the sum of the values of the Companies' inventory and accounts receivable. The Companies were permitted under their arrangement with the bank to borrow up to an amount equal to 85 percent of the value of current accounts receivable, plus 60 percent of the value of the current inventory, less whatever loan principal was outstanding (never to exceed the $10.5 million maximum).

The loan agreement provided that the Companies would deposit all payments from customers into "blocked" accounts at Chase, from which only the bank could make withdrawals. Chase would then "sweep" the accounts periodically, using the money taken from them to pay down the Companies' loan balance.

Certain accounts receivable were deemed "ineligible" for purposes of determining the borrowing base because the bank considered it unlikely that

5

those amounts would be repaid.  For example, the Companies were not permitted to borrow against accounts receivable more than 90 days past due or purchase orders that had not yet been fulfilled.  The Companies would periodically file a "borrowing base report," which was supposed to reflect the combined value of accounts receivable and inventory.  To confirm the information in the borrowing base report, and to verify generally the Companies' accounting standards, Chase "field examiners" were permitted to audit random samples of the Companies' records.  One such field examiner, Edward Grayeski, testified at trial that he had conducted field tests between 1996 and 1998, and that his review raised red flags with respect to some of the accounts receivable.  Although the Companies were initially able to deflect the bank's concerns about the accuracy of their records, examiners eventually uncovered the fraudulent scheme, described below, that underlies this case.

*The Scheme*

Peters does not dispute that the Companies engaged in a fraudulent scheme to manipulate the accounts receivable in order to inflate their borrowing base.  Starting sometime in 1997, the Companies began experiencing cash-flow shortages due to a low sales volume.  In response, the Companies developed ways to increase cash flow.  Gregory Samer, a WAPI employee who pleaded

6

guilty under the same indictment that named Peters as a defendant, testified as a cooperating witness at Peters's trial. Samer detailed three different fraudulent accounting practices committed by Peters and the Companies in order to increase the cash available through the Chase loan: (1) "holding the month open"; (2) "prebilling"; and (3) "rebilling."

The practice of "holding the month open" consisted of including in a particular month an account receivable that did not actually ripen until the following month. For example, Samer might instruct Cheryl Martinez, who worked in WAPI's billing department, to include invoices from the first two weeks of February in the January Accounts Receivable Report. Martinez would then backdate what should have been a February invoice to make it appear as though the goods sold had been shipped in January. If the product did eventually ship to the customer, Martinez would produce a hand-typed invoice that reflected the actual date of shipment.

"Prebilling" referred to the practice of creating a sales invoice for an order before any goods were shipped, thereby making an unripe purchase order appear to be an account receivable. For example, in January 2000, a company named ATCO placed a purchase order with Bighorn for $850,000 worth of air-conditioning cores. Bighorn lacked both the inventory to fulfill the order and

7

sufficient cash to purchase the inventory. Employees at Bighorn created an invoice falsely indicating that the ATCO order had shipped, which allowed them to include an $850,000 order in the Accounts Receivable Report for that month. As a result, Chase was duped into lending the Companies more money -- money that Chase expected to be repaid through a sale that, in fact, might never come to fruition.

The practice of "rebilling" was, in effect, an end-run around Chase's policy of excluding accounts receivable that were more than 90 days old from the borrowing base. Employees at the Companies would generate a new invoice for an old sale with a false date somewhere within the previous 90 days so that the receivable could be included in the borrowing base report.

Although there was evidence in the record that Chase was aware of at least some of these practices, the bank appears to have been unaware of the extent to which the Companies' employees were artificially inflating the Companies' borrowing base. Chase ultimately uncovered the full extent of the fraud in or around May 2000, when a Bighorn employee named Ron Hall disclosed it to Chase examiners.

*The Creation of ITEC*

In early 2000, Peters created a corporation named Innovative Transmission and Engine Company ("ITEC") into which he spun off the Companies' heavy-duty equipment department. Peters opened a bank account for ITEC at another institution, M&T Bank. Several customers who had sent payments to WAPI were sent correspondence informing them that WAPI had changed its name and asking that the payment be reissued to ITEC. The reissued checks were deposited in ITEC's account at M&T Bank, instead of in the Companies' Chase accounts, where the loan agreement required that such payments be deposited. Chase was thus deprived of money that was supposed to have been used to pay down the loan.

*Procedural History*

On October 22, 2003, a grand jury in the United States District Court for the Western District of New York returned an eighteen-count indictment against Peters, Samer, and the chief financial officer of the Companies, Mark Hoffman. The indictment charged Peters with a host of crimes, including one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1014 and § 1344, in connection with the Companies' accounting practices and the creation of ITEC; four counts of making a false statement to a bank, in violation of 18

9

U.S.C. § 1014, in connection with four separate instances of fraudulently inflating the borrowing base; four counts of bank fraud, in violation 18 U.S.C. § 1344, three of them alleging false statements in connection with alleged payments from the Companies to the defendant, and the fourth in connection with the ATCO prebill; one count of money laundering, in violation of 18 U.S.C. § 1957; and three counts of mail or wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, in connection with the diversion of payments to ITEC.

Samer was charged with the conspiracy and bank fraud counts, and Hoffman was charged with the conspiracy and mail and wire fraud counts. The last five counts sought criminal forfeiture of the proceeds of the allegedly fraudulent activity. In February 2005, Samer pleaded guilty to the conspiracy count and agreed to cooperate with the government.

A jury trial began in May 2007. Although all parties agreed that a fraudulent scheme to inflate the borrowing base had occurred, Peters disputed that he participated in it and argued that he was in fact its victim. On July 20, 2007, the district court granted Peters's motions for acquittal on three bank-fraud counts -- the counts alleging payments to Peters for personal use -- and the money laundering count. On July 30, 2007, the jury convicted Peters of one count of conspiracy to commit bank fraud, one count of making a false statement to a

bank, one count of bank fraud, two counts of wire fraud, and one count of mail fraud. The jury acquitted him of three counts of making a false statement to a bank. Hoffman was acquitted of all counts.

On January 27, 2011, the district court sentenced Peters principally to 108 months' imprisonment, and ordered him to pay $11,988,501.36 in restitution. The government and Peters had agreed that the district court would resolve the forfeiture counts, which it did in March 2009 by entering a forfeiture money judgment of $23,154,259. *Peters*, 257 F.R.D. at 390.

## DISCUSSION

On appeal, the defendant advances several arguments challenging the fairness of his trial and his sentence. We address most of these arguments in a summary order decided simultaneously herewith affirming the defendant's conviction and the amount of restitution awarded at sentencing. *See United States v. Peters*, --- F. App'x ---, --- WL ---, --- U.S. App. LEXIS --- (2d Cir. [date] 2013). The defendant also argues that the district court erred by entering a forfeiture order in the amount of $23,154,259 because (1) the criminal forfeiture statute, 18 U.S.C. § 982(a)(2), requires forfeiture only of profits, not of gross receipts, and (2) the district court erred in finding that the Companies were his alter egos such

11

that the court could impose a forfeiture order against him personally. It is this

challenge to the forfeiture award that we consider here.

We review a district court's legal conclusions -- including those

regarding the application of the forfeiture statute -- *de novo*, and all underlying

factual findings for clear error. *United States v. Gaskin*, 364 F.3d 438, 461-62 (2d

Cir. 2004).

I.      Criminal Forfeiture Under 18 U.S.C. § 982(a)(2)

The forfeiture statute at issue here is 18 U.S.C. § 982(a)(2), which

provides in relevant part:

> The Court, in imposing sentence on a person convicted
> of a violation of, or a conspiracy to violate ––
>
> (A) section . . . 1014, 1341, 1343, or 1344 of this title,
> affecting a financial institution . . .
>
> shall order that the person forfeit to the United States
> any property constituting, or derived from, proceeds the
> person obtained directly or indirectly, as the result of
> such violation.

*Id.*

Federal Rule of Criminal Procedure 32.2(b)(1)(A) requires a trial

court, "[a]s soon as practical after a verdict . . . of guilty" against a defendant, to

"determine what property is subject to forfeiture under the applicable statute."

12

*Id.* "If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." *Id.* The government must establish the nexus between the offense and the forfeiture request by a preponderance of the evidence. *See United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007).

Criminal forfeiture under section 982 is a form of punishment, separate and apart from any restitutive measures imposed during sentencing. Forfeiture of money under section 982, unlike restitution, "constitutes punishment," because the statute directs the court to order it "as an additional sanction when 'imposing sentence on a person convicted' of the relevant offense" and because "[criminal] forfeiture serves no remedial purpose, is designed to punish the offender, and cannot be imposed upon innocent owners." *United States v. Bajakajian*, 524 U.S. 321, 328, 332 (1998); *see also Libretti v. United States*, 516 U.S. 29, 39 (1995) ("Our precedents have likewise characterized criminal forfeiture as an aspect of punishment imposed following conviction of a substantive criminal offense."). A court's discretion in ordering criminal forfeiture is cabined by the Eighth Amendment's Excessive Fines Clause. The amount of forfeiture "must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334.

## II.     The District Court's Decision

The defendant elected to have the district court, rather than the jury, resolve the criminal forfeiture charges against him. The government requested an order of forfeiture in the amount of $28,204,200, which represented the sum of (1) all disbursements under the 1998 Chase loan, (2) payments the defendant diverted from WAPI to ITEC, and (3) payments made from the Companies directly to the defendant -- e.g., as salary, car payments, and rent -- between 1996 and 1998.

The district court ordered criminal forfeiture by Peters in an amount equal to the sum of (1) all disbursements under the 1998 Chase loan, and (2) all payments diverted from WAPI to ITEC. *Peters*, 257 F.R.D. at 388-89. In doing so, the court rejected Peters' argument that he should be liable only for the "profits" generated by the fraud. *Id.* at 388. The district court also concluded that WAPI and Bighorn were the defendant's corporate alter egos for the purpose of piercing the corporate veil and finding the defendant personally liable under section 982(a)(2). *Id.* at 385. The court rejected the government's request for forfeiture of payments made to the defendant from the Companies between 1996 and 1998, concluding that there was insufficient evidence to connect any pre-1998 payments to any offenses for which the defendant was convicted. *Id.* at 388.

14

After doing the arithmetic, the court imposed a money judgment against Peters in the amount of $23,154,259. *Id.* at 390.

III.    Analysis

### A.    *Proceeds Versus Profits*

On appeal, Peters urges us to read "proceeds" in section 982 to include only the profits of his fraud. Section 982 does not supply a definition of the term "proceeds." Neither have we determined whether, as used in section 982(a)(2), "proceeds" means profits or gross receipts. We ultimately agree with the district court that the term "proceeds" is not limited to profits.

*1. Textual Arguments.* When a term in a statute is undefined, we are to give it its ordinary meaning. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). "Proceeds," however, "can mean either 'receipts' or 'profits.' Both meanings are accepted, and have long been accepted, in ordinary usage." *United States v. Santos*, 553 U.S. 507, 511 (2008). The term "'[p]roceeds,' moreover, has not acquired a common meaning in the provisions of the Federal Criminal Code. . . . Congress has defined 'proceeds' in various criminal provisions, but sometimes has defined it to mean 'receipts' and sometimes 'profits.'" *Id.* at 511-12.

The defendant argues that this case is controlled by *Santos*, a case involving an illegal lottery. In *Santos*, the Supreme Court construed the word

15

"proceeds" in the federal anti-money laundering statute, 18 U.S.C. § 1956, to mean profits, rather than gross receipts. A plurality of the *Santos* Court found that because "[f]rom the face of the statute, there is no more reason to think that 'proceeds' means 'receipts' than there is to think that 'proceeds' means 'profits,'" the rule of lenity required that "the tie must go to the defendant." *Id.* at 514.

The defendant would have us conclude that the term "proceeds" under section 982(a)(2) must therefore also be limited to "profits." The problem with the defendant's argument is that, under the rule announced by the Supreme Court in *Marks v. United States*, 430 U.S. 188 (1977), the holding in *Santos* is limited to the "position taken by those Members who concurred in the judgments on the narrowest grounds," *id.* at 193 (internal quotation marks omitted). And as we explained in *United States v. Quinones*, 635 F.3d 590 (2d Cir.), *cert. denied*, 132 S. Ct. 830 (2011), Justice Stevens' concurrence controls the scope of the Court's holding in *Santos*. *Id.* at 599 (citing *Santos*, 553 U.S. at 523). Unlike the plurality, Justice Stevens would have held that "proceeds" meant "profits" when the anti-money laundering statute was applied to specified unlawful activities, but that it meant "receipts" when applied to others. *Santos,* 553 U.S. at 525 (Stevens, J., concurring).

16

We need not and do not decide here the precise contours of *Santos*'s holding. It is enough to observe, as we did in *Quinones*, that a key point of agreement among the plurality and Justice Stevens was the desire to avoid a "merger problem." *Quinones*, 635 F.3d at 599. In the context of the illegal lottery at issue in *Santos*, the plurality explained that "[i]f 'proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." *Santos*, 553 U.S. at 515. Justice Stevens agreed that such payments would necessarily be funded by the "receipts" of illegal activity. *Id.* at 526-27 (Stevens, J., concurring). And he agreed with the plurality that Congress could not have intended violations of the money-laundering statute to "merge" in this way with violations of other statutes. *Id.* at 528 & n.7.

By contrast, the criminal forfeiture statute presents no merger issue. Unlike the anti-money laundering statute, section 982(a)(2) is a form of punishment rather than a substantive criminal offense. There is therefore no risk of what Justice Stevens called a "practical effect tantamount to double jeopardy," *id.* at 527, when section 982(a)(2) captures funds essential to the commission of one of its predicate offenses. Because the concerns uniting Justice Stevens's

17

concurrence and the plurality in *Santos* do not apply in the context of criminal forfeiture, *Santos* does not control the question of how to interpret "proceeds" for the purposes of section 982(a)(2).

Turning then to the text, the defendant points to subsections (a)(3) and (4) of section 982, which apply to violations of other statutes and which require forfeiture of all property traceable to "gross receipts obtained" as a result of the violation.[2] The government counters by pointing to the seemingly broad language of section 982, which reaches "any property . . . obtained directly or indirectly" from the crime. The government notes that, in interpreting nearly identical language in 21 U.S.C. § 853, which addresses criminal forfeiture in the context of narcotics violations, the Supreme Court was of the view that "Congress could not have chosen . . . broader words to define the scope of what was to be forfeited." *United States v. Monsanto*, 491 U.S. 600, 607 (1989).

We do not find either of these arguments particularly helpful or persuasive. For much the same reasons the *Santos* Court thought that the term

---

[2] Although Peters does not cite it, another example is section 982's civil cousin, 18 U.S.C. § 981. In imposing civil forfeiture for unlawful activity -- indeed, for the same types of fraud for which the defendant was convicted -- that provision explicitly states that "the court shall allow the claimant a deduction from the forfeiture to the extent that the loan was repaid, or the debt was satisfied, without any financial loss to the victim." 18 U.S.C. § 981(a)(2)(C).

"proceeds" in section 1956 was ambiguous in the context of money laundering, we think that the term is ambiguous as used in section 982.

2. *Primary Purpose of Section 982.* "Where the language of a statute is ambiguous, we focus upon the 'broader context' and 'primary purpose' of the statute." *Castellano v. City of New York*, 142 F.3d 58, 67 (2d Cir. 1998) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 345-46 (1997)). Here, the punitive intent of section 982 favors the government's interpretation of the word "proceeds." Criminal forfeiture is a form of punishment. As such, it is distinct from restitution or other remedial actions, which are intended to return the victim and the perpetrator to the status quo that existed before the violation took place.

We agree with the government that doing no more than returning a "wrongdoer to the economic position he occupied before he committed his criminal offense does not provide much of a deterrent to those who might be tempted to follow in his footsteps." Gov't Br. at 64. That is not "punishment." Moreover, as the Eighth Circuit noted in a case involving forfeiture under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1963(a)(3), a broad reading of "proceeds" in the context of criminal forfeiture punishes "all convicted criminals who receive income from illegal activity, and

19

not merely those whose criminal activity turns a profit." *United States v. Simmons*, 154 F.3d 765, 771 (8th Cir. 1998).

We also find relevant the fact that it may often, although not always, be difficult to isolate and identify the "profits" of criminal activity. Here, for example, the fraudulent accounting practices at the heart of the scheme also make it challenging to determine what exactly became of the loan disbursements. As the Eighth Circuit noted, quoting the RICO forfeiture provision's legislative history, "[i]t should not be necessary for the prosecutor to prove what the defendant's overhead expenses were." *Id.*; *see also United States v. McHan*, 101 F.3d 1027, 1042 (4th Cir. 1996) ("Were we to read proceeds in § 853 [the narcotics forfeiture statute] to mean only profits, . . . we would create perverse incentives for criminals to employ complicated accounting measures to shelter the profits of their illegal enterprises.").

We conclude that reading "proceeds" to mean "receipts" rather than "profits" in the context of section 982(a)(2) better vindicates the primary purpose of the statute. In so doing, we agree with the Ninth Circuit that in enacting the section, "Congress sought to punish equally the thief who carefully saves his stolen loot and the thief who spends the loot on 'wine, women, and song.'" *United States v. Newman*, 659 F.3d 1235, 1243 (9th Cir. 2011). "[T]he 'proceeds' of a

20

fraudulently obtained loan equal the amount of the loan," *id.* at 1244, irrespective of whether the defendant personally profited from the loan or whether the bank recovered part of the loan principal.

We came to a similar conclusion in *United States v. Awad*, 598 F.3d 76 (2d Cir. 2010) (per curiam). There, we held that criminal forfeiture under 21 U.S.C. § 853 "permits imposition of a money judgment on a defendant who possesses no assets at the time of sentencing." *Id.* at 78. Because "[m]andatory forfeiture is concerned not with how much an individual has but with how much he received in connection with the commission of the crime," *id.* at 78 (internal quotation marks omitted, brackets in original), we conclude that the term "proceeds" as used in section 982(a)(2) means "receipts."

### B.     *"Obtained Indirectly"*

Section 982(a)(2) directs that a person must forfeit to the United States any proceeds "the person obtained directly or indirectly, as the result of such violation." As he did before the district court, the defendant argues on appeal that it was the Companies, not he, that "obtained" the proceeds of the Chase loan. The government responds that the defendant should not be permitted to shield himself from liability behind the Companies' corporate form.

It asserts that the district court properly "pierced the corporate veil" to find that the defendant "obtained" the loan proceeds through his corporate alter ego.

The proceeds subject to forfeiture are those obtained both directly and *indirectly* as a result of the criminal violation. 18 U.S.C. § 982(a)(2). It seems to us beyond doubt that any loan proceeds transferred from the Companies to the defendant personally are obtained by him "directly" and are properly subject to forfeiture. This, however, accounts for only a relatively small fraction of the forfeiture award -- just over $2.3 million.

The second, more difficult issue -- and one as to which the parties have not identified any prior decision binding on us -- is under what circumstances an individual can be said to have "obtained . . . indirectly" the proceeds of his criminal conduct through a corporate entity. The district court analyzed the question with reference to New York's "complete domination" theory of corporate alter ego liability and found that the defendant "obtained" the loan proceeds because the Companies were his alter egos for purposes of "piercing the corporate veil." *Peters*, 257 F.R.D. at 385. Applying this theory of liability, the district court concluded that the defendant obtained the loan proceeds indirectly through the Companies as his corporate alter egos.

22

The court based its conclusion on the fact that: (1) the defendant and his wife together owned 98 percent of the Companies and the defendant's sister-in-law owned 1 percent, leaving only 1 percent of the Companies outside of family control; and (2) the defendant "controlled [the Companies] on a day-to-day basis." *Id.* Among other things, the court found that Peters "hired new employees"; "directed product managers at [the Companies] on all aspects of business"; "moved money in and out of [the Companies], and had the ability to direct wire transfers from the corporate accounts"; "owned or had interests in the companies that owned the buildings where [the Companies] were housed, as well as other corporate entities that had business relationships with [the Companies]"; "directed the corporate accounting and billing methods"; "knew about, approved, and directed the practices of 'holding months open,' 'prebilling,' 'rebilling,' and the use of false invoices, which essentially constituted the fraud against Chase"; and "was instrumental in securing and renewing" the line of credit with Chase in June 1998. *Id.* at 385-86. The court concluded that the evidence demonstrated that the defendant "completely dominated [the Companies] such that they were his alter egos." *Id.* at 386.

Although the district court relied on the doctrine of "piercing the corporate veil," we find it unnecessary to do so and thereby avoid entering into

23

the somewhat complicated jurisprudence involved. *See Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 140-41, 623 N.E.2d 1157, 1160, 603 N.Y.S.2d 807, 810 (1993) ("The doctrine of piercing the corporate veil is typically employed by a third party seeking to go behind the corporate existence in order to circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation . . . . Thus, an attempt of a third party to pierce the corporate veil does not constitute a cause of action independent of that against the corporation . . . ."). We conclude instead that, under the terms of the statute, the defendant "indirectly" obtained the loan proceeds, rendering him liable for forfeiture in connection with them.[3]

Because the question of whether an individual obtains proceeds "indirectly" through a corporation involves the interpretation of a federal statute, we examine it under federal law. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) ("[I]n the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act

---

[3] *See Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006) ("[W]e are free to affirm a decision on any grounds supported in the record, even if it is not one on which the trial court relied.").

dependent on state law." (internal quotation marks omitted; ellipsis in original )).[4]

We therefore do not suggest that the government must satisfy state law requirements for piercing the corporate veil in order to establish that proceeds of criminal activity were "indirectly" obtained under the forfeiture statute. But although we reject the government's assertion that New York law controls this issue, *see* Gov't Br. at 70 n.8, we agree with the district court's analysis insofar as it borrowed from principles of alter ego liability that may be relevant to the question of whether an individual indirectly obtained the proceeds of his or her criminal conduct through a corporation.

Also drawing in part on principles of alter ego liability, we conclude that, in the context of a criminal forfeiture proceeding under section 982, an individual "obtains" proceeds "indirectly" through a corporation when the individual "so extensively control[s]," *First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629 (1983), or "dominate[s],"

---

[4] Even in the absence of this presumption, because this case arises under federal question jurisdiction and involves a federal statute that "demands national uniformity," federal common law, not New York State law, presumably controls the question of whether the corporate veil should be pierced. *See Brotherhood of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 25-26 (1st Cir. 2000); *see generally* Note, *Piercing the Corporate Veil: The Alter Ego Doctrine under Federal Common Law*, 95 Harv. L. Rev. 853 (1982) (describing circumstances under which federal law should govern the corporate veil-piercing inquiry).

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 17 (2d Cir. 1996), the corporation and its assets that money paid to the corporation was effectively under the control of the individual. Factors that we think are likely to be relevant to this question include the individual's ownership interest; the level of control he exercised over the company; his authority to direct the disposition of corporate assets and the degree to which he exercised that authority; and the use of corporate assets for his personal expenses.

The district court made several sound factual findings to support its conclusion that the corporate veil should be pierced to hold the defendant liable for forfeiture of the loan proceeds. While we find it unnecessary to employ that doctrine here, most of the court's findings are equally relevant to the question of whether the defendant obtained the loan proceeds indirectly.

Of particular significance are the court's findings that the defendant and his family together owned 99 percent of the company; that the Companies "operated under [the defendant's] direction and control, and all significant tasks were completed according to his instructions"; that the defendant "moved money in and out of [the Companies], and had the ability to direct wire transfers from the corporate accounts"; that he "directed the corporate accounting and billing methods" and "directed the practices of 'holding months open,' 'prebilling,'

26

'rebilling,' and the use of false invoices; and that he was "instrumental in securing and renewing the line of credit from Chase," which he "could access at will." *Peters*, 257 F.R.D. at 385-86. The district court also noted that the defendant paid himself an escalating salary from $100,000 to $120,000 in 1990 to between $285,000 and $287,000 in 2000, and that WAPI paid for two vehicles for the defendant, neither of which were used for corporate business. *Id.* at 385.

We see no error, let alone clear error, in the district court's factual determinations. Based on them, we conclude that Peters did indeed obtain "indirectly" the proceeds of his criminal conduct, i.e., the relevant loan proceeds. He effectively owned 99 percent of the Companies and exercised almost total control over their management and finances. He also had complete access to and control over the Companies' assets. We therefore agree with the district court that the defendant should be held accountable for forfeiture of the loan proceeds, although we reach this conclusion on the ground that the defendant himself obtained these proceeds "indirectly."

## CONCLUSION

For the foregoing reasons, the judgment of the district court imposing criminal forfeiture is affirmed in its entirety.

27