18-2482(L)
*United States v. Pastore*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 8th day of June, two thousand twenty-two.

PRESENT: JOHN M. WALKER,
RICHARD J. SULLIVAN,
    *Circuit Judges*,
ALISON J. NATHAN,
    *District Judge.*\*

_____

UNITED STATES OF AMERICA,

    *Appellee*,

    v.                                                                    Nos. 18-2482(L),
                                                                                  18-2610(Con)

STEVEN PASTORE, SALVATORE DELLIGATTI,

    *Defendants-Appellants.*†

_____

_____

\* Judge Alison J. Nathan, of the United States District Court for the Southern District of New York, sitting by designation at the time this case was heard.

† The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

FOR DEFENDANTS-APPELLANTS: VIVIAN SHEVITZ, (Larry J. Silverman, *on the brief*), Attorneys at Law, South Salem, NY, *for Appellant* Steven Pastore.

LUCAS ANDERSON, Rothman, Schneider, Soloway & Stern, LLP, New York, NY, *for Appellant* Salvatore Delligatti.

FOR APPELLEE: JORDAN L. ESTES, Assistant United States Attorney (Samson Enzer, Jason M. Swergold, Karl Metzner, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY.

Appeal from judgments of conviction and sentences in the United States District Court for the Southern District of New York (Katherine B. Forrest, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Defendants-Appellants Steven Pastore and Salvatore Delligatti appeal from judgments entered by the United States District Court for the Southern District of New York in connection with their participation in a criminal enterprise known as the Genovese Crime Family (the "Family").[1] Delligatti was sentenced to 300

---

[1] Decision of this case was delayed by the panel's need to await its turn in a queue of cases pending in this Circuit resolving questions arising from the Supreme Court's ruling in *United States v.*

months' imprisonment after a jury found him guilty of conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d) (Count One); conspiracy to commit murder in aid of racketeering and attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Counts Two and Three); conspiracy to commit murder-for-hire, in violation of 18 U.S.C. § 1958 (Count Four); illegal gambling, in violation of 18 U.S.C. § 1955 (Count Five); and using a firearm during and in relation to a crime of violence, and possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Seven). Pastore, who pleaded guilty to Count One only, was sentenced to 24 months' imprisonment and was ordered to forfeit $125,000.

Delligatti raises an assortment of challenges on appeal, including that (1) the evidence at trial was not sufficient to sustain his convictions on Counts One, Two, Three, and Five; (2) Counts One and Four of his indictment lacked adequate information and were constructively amended at trial; (3) the district court erroneously admitted certain testimony at trial; and (4) his sentence of 300 months' imprisonment is substantively unreasonable.[2] Pastore challenges his forfeiture

_Davis_, 139 S. Ct. 2319 (2019), interpreting "crime of violence." *See United States v. Laurent*, 33 F.4th 63, 73 n.3 (2d Cir. 2022).

[2] Delligatti also challenges his conviction on Count Seven for use of a firearm during and in relation to a "crime of violence," arguing that the underlying predicates were not crimes of

order on various grounds, arguing that a jury should have determined the amount and that the district court improperly calculated the total and relied on insufficient evidence. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

## I.    Sufficiency of the Evidence

Delligatti challenges the sufficiency of the evidence underlying his racketeering convictions (Counts One through Three) and gambling conviction (Count Five). We review each challenge de novo, "and must affirm if the evidence, when viewed in its totality and in the light most favorable to the government, would permit any rational jury to find the essential elements of the crime beyond a reasonable doubt." *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004).

Delligatti first contends the government failed to identify the "core" personnel of the Family and thus did not sufficiently prove an "enterprise" as required to convict him of his racketeering charges. At trial, a government agent and a cooperating witness who was a member of another crime family testified about the structure of the Family, the illegal activities of Family members, and the Family's role in the broader network of organized crime families known as La

violence in light of *Davis*, 139 S. Ct. 2319. We address that challenge in a separate opinion that accompanies this summary order.

4

Cosa Nostra. While these witnesses did not identify every individual in the Family, they described the structure of the enterprise and specified persons functioning as a "continuing unit" during the relevant period. *United States v. Turkette*, 452 U.S. 576, 583 (1981) (explaining that an enterprise is "proved by evidence of an ongoing organization, formal or informal, . . . [with] various associates function[ing] as a continuing unit"); *see United States v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010) (recognizing that an enterprise "may continue to exist even though it undergoes changes in membership" (citation omitted)). Further, the government offered extensive evidence of Delligatti's association with the Family and his engagement in criminal activities with a Genovese soldier named Robert DeBello and two Genovese associates, Ryan Ellis and Robert Sowulski. This evidence was more than sufficient to establish the existence of an enterprise.

Next, Delligatti argues that the government did not sufficiently establish a "pattern" of racketeering activity to prove an offense under the Racketeering Influenced and Corrupt Organizations Act ("RICO"). He also contends that, because the jury was not asked to return a special verdict sheet as to Count One, it is impossible to know which charged acts constitute the requisite "pattern" of activity. A "pattern of racketeering activity" under RICO requires at least two

5

racketeering acts within a ten-year span, excluding periods of imprisonment; acts linked to the same racketeering enterprise are ordinarily sufficient to establish such a pattern. *See United States v. Daidone*, 471 F.3d 371, 374–76 (2d Cir. 2006); *United States v. Indelicato*, 865 F.2d 1370, 1383–84 (2d Cir. 1989) (stating that an act in furtherance of a racketeering business "automatically carries with it the threat of continued racketeering activity").

Count One of the indictment charged that members and associates of the Family – a criminal enterprise – engaged in various crimes "including conspiracy to commit murder; attempted murder; extortion; and the operation of illegal gambling businesses." Delligatti App'x at 39. At trial, the district court instructed the jury that it did not need to "decide whether [Delligatti] agreed to the commission of any particular racketeering act" to convict him of Count One, but it had to "be unanimous as to which type or types of predicate racketeering activity [he] agreed would be committed." *Id.* at 438. The court later instructed the jury on the elements of each predicate offense.

Based on the trial record, we are persuaded that there was ample evidence to prove Delligatti's involvement in multiple predicate acts linked to the Family. As discussed below, the jury heard that (1) Delligatti directed a murder plot; (2)

6

DeBello approved and financially benefitted from that plot; (3) Delligatti and DeBello intimidated a nightclub owner and employee to obtain payments from the club; and (4) Delligatti participated in an illegal gambling scheme run by another Genovese associate. The evidence shows that the predicate acts charged in Count One were "related" to the Family and together "amount[ed] to . . . continued criminal activity" sufficient to establish a "pattern" of racketeering activity. *Daidone*, 471 F.3d at 375.

Delligatti also argues that his convictions for conspiracy to commit murder in aid of racketeering and attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Counts Two and Three), must be dismissed because the government did not present sufficient evidence that Delligatti planned a murder for the purpose of gaining entrance to or maintaining a position within the Family. But while section 1959 permits the government "to prosecute defendants for violent crimes intended . . . to permit a defendant to maintain or increase [his] position in a RICO enterprise," *United States v. Pimentel*, 346 F.3d 285, 295 (2d Cir. 2003) (internal quotation marks omitted), the government need not prove that "was the defendant's sole or principal motive," *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992).

Delligatti emphasizes that he was solicited and paid to kill Joseph Bonelli not by a member of the Family, but by Luigi Romano, the owner of a local gas station whom Bonelli had "terrorized." Delligatti App'x at 346. Trial testimony established, however, that Family members frequented Romano's gas station, that the Family was engaged in bookmaking, and that Bonelli was suspected of cooperating with the police against bookmakers. The jury also heard testimony that DeBello, a Genovese soldier, approved Bonelli's murder and received a cut of the amount Romano paid for the hit. From this evidence, a rational jury could readily infer that Delligatti plotted Bonelli's murder, at least in part, to benefit the Family and to advance his status within the Family. *See United States v. Whitten*, 610 F.3d 168, 179–80 (2d Cir. 2010) (finding intent under section 1959 where testimony established that committing violence authorized by crew leaders could enhance status); *Concepcion*, 983 F.2d at 381.

Finally, Delligatti argues there was insufficient evidence to support his conviction for participating in the operation of an illegal gambling business. To prove that Delligatti participated in the operation of an illegal gambling business as charged in the indictment, the government had to show, among other things, that the business (1) involved five or more people and (2) received more than five

8

bets totaling over $5,000 in one day. *See* 18 U.S.C. § 1955; N.Y. Penal Law § 225.10(1).

The evidence at trial clearly established that Delligatti was a "runner" in a sports-betting operation led by Genovese associate Ryan Ellis; that Delligatti had a "sheet" with Ellis – meaning that Delligatti set up clients to bet and received some of the proceeds if his clients lost; that DeBello also received a cut of the proceeds from the operation; and that the business employed numerous other runners, including Luigi Caminiti, Michael Vigorito, and Scott Jacobson. The government also introduced one of Jacobson's gambling sheets, which itself showed that fifteen clients had placed bets and lost a total of $5,982 in a single day. Considered as a whole, this evidence sufficiently supported Delligatti's conviction on Count Five.

## II. Adequacy of Indictment & Jury Instructions

Delligatti argues for the first time on appeal that his convictions on Count One (racketeering conspiracy) and Count Four (murder-for-hire conspiracy) should be reversed because his indictment failed to specify certain necessary details and statutory citations. Because Delligatti did not raise this claim "prior to trial, as unambiguously required by the law of th[is] Circuit," and he has shown

no cause for failing to timely do so, the claim "must be rejected." *United States v. Spero*, 331 F.3d 57, 61–62 (2d Cir. 2003); *see also* Fed. R. Crim. P. 12(b)(3)(B) (requiring that objections alleging "a defect in the indictment" for "lack of specificity" or "failure to state an offense" be raised by pretrial motion if "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits").

Delligatti also maintains that the district court's jury instructions on Counts One and Four constructively amended his indictment. Because he failed to object to these instructions at trial, we review for plain error. *See United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009). To prevail on this challenge, Delligatti "must demonstrate that . . . the presentation of evidence and jury instructions . . . so modif[ied] *essential elements* of the offense charged that there is a substantial likelihood that [he] may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) (internal quotation marks omitted). Upon review of the indictment and the district court's detailed jury instructions, we find no basis for concluding that Count One or Four were constructively amended.

### III. Evidentiary Rulings

Next, Delligatti challenges the district court's admission of certain testimony at trial. We review the court's evidentiary rulings for abuse of discretion and reverse only if the court based its decision "on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if its decision cannot be located within the range of permissible decisions." *United States v. Barret*, 848 F.3d 524, 531 (2d Cir. 2017).

Delligatti first contests the admission of expert testimony from Special Agent John Carillo, who testified about the structure and conduct of La Cosa Nostra and the Genovese Crime Family, as well as the code of silence known as "Omerta." Agent Carillo's testimony gave context to the crimes charged; his specialized knowledge was also highly probative as to whether the Family was an "enterprise" and whether Delligatti's acts were related to that enterprise. *See* Fed. R. Evid. 702(a); *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (allowing testimony "on the nature and function of organized crime families, imparting the structure of such families and disclosing the 'rules' of . . . La Cosa Nostra"). It was not an abuse of discretion to admit this testimony.

Delligatti next challenges the district court's decision to allow testimony from Philip Gurian, who testified that he ran a sports-betting operation with Delligatti and another Genovese associate – Christopher Castellano – who was later suspected of cooperating with law enforcement and subsequently killed. Although there was no evidence that Delligatti was involved in Castellano's murder, the court concluded that Gurian's testimony about Castellano was "directly relevant to the existence and nature of the charged [racketeering] conspiracy" and "would help the jury understand why Delligatti would have been willing to murder Bonelli – who, like Castellano, was suspected of cooperating with law enforcement." Delligatti App'x at 91. The court also found that such evidence was "similar to, and no more prejudicial than the crimes with which Delligatti has been charged." *Id.*

Evidence that Castellano had been considering cooperating and was later murdered was relevant to establishing Delligatti's motive for killing Bonelli (another suspected cooperator), especially when coupled with testimony about the Family's rule prohibiting cooperation on penalty of death. *See* Fed. R. Evid. 403. Moreover, Gurian's brief testimony about Castellano's murder was not "more sensational or disturbing" than evidence of the charged crimes, which included

12

Delligatti's extensive efforts to have Bonelli killed. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). On balance, we find that the district court did not abuse its discretion in admitting this testimony.

Delligatti separately argues that Gurian's testimony included improper hearsay statements that Castellano made to Gurian when they were both incarcerated. We agree with the district court that these statements were admissible as statements against Castellano's penal interest under Rule 804(b)(3) of the Federal Rules of Evidence. Rule 804(b)(3) permits the admission of a hearsay statement at trial "if the declarant is unavailable as a witness," and the statement is one that (1) "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency . . . to expose the declarant to civil or criminal liability; and" (2) "is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."

Gurian testified that Castellano said he was an "enforcer" for two Genovese soldiers, Federici and Romanello, which Gurian understood to mean that Castellano "would intimidate people, beat people up, [and] hurt people to collect

13

money to end up accomplishing whatever result" the mobsters demanded. Delligatti App'x at 280. These statements clearly would have subjected Castellano to criminal liability. *See United States v. Gupta*, 747 F.3d 111, 129 (2d Cir. 2014); *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011). Corroborating evidence also bolsters the trustworthiness of Castellano's statements: Castellano made these statements to Gurian, his friend and fellow inmate, rather than to law enforcement agents "whose favor he might be expected to curry." *United States v. Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983); *see Gupta*, 747 F.3d at 127. Further, after both men were out of prison, Castellano introduced Gurian to Federici at a dinner and connected Gurian with Delligatti, a fellow Genovese associate who also knew Romanello. And since Castellano's death in 2010 made him unavailable at trial, the district court did not err in admitting Castellano's prior statements under Rule 804(b)(3).

Finally, Delligatti challenges the district court's decision to permit Robert Sowulski to testify about Delligatti's suggestion that they plant a bomb in a club targeted by the Family for extortion. Delligatti argues these statements made him look like a "volatile and violent person" but were not probative of an existing extortion conspiracy, and thus should have been excluded under Federal Rules of

Evidence 402 and 403. Delligatti Br. at 56. But Delligatti's willingness to plant a bomb at a nightclub after prior failed efforts to intimidate and take over the club was highly probative of his participation in a racketeering conspiracy involving extortion. Though no bomb was ultimately planted, Delligatti's proposal was relevant to establish his state of mind and intent while participating in the racketeering conspiracy. The court properly exercised its discretion in admitting that testimony.

## IV.    Reasonableness of Sentence

Lastly, Delligatti challenges the substantive reasonableness of his below-Guidelines sentence because of "[t]he stark disparities" between his 300-month sentence and the sentences of his co-defendants. Delligatti Br. at 58. We review a sentence for substantive reasonableness under "a deferential abuse-of-discretion standard," "tak[ing] into account the totality of the circumstances" and "giving due deference to the sentencing judge's exercise of discretion." *United States v. Cavera*, 550 F.3d 180, 189–90 (2d Cir. 2008) (en banc) (internal quotation marks omitted). In this case, Delligatti's sentence fell below the minimum advisory Sentencing Guidelines sentence of 324 months. Moreover, while district courts are not required to consider disparities among co-defendants – particularly if they are

15

not similarly situated, *see United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009) –

here the court properly considered the section 3553(a) factors and applied a

downward variance to prevent too great a disparity between Delligatti and his co-

defendants. Because this was well "within the range of permissible decisions," we

affirm. *See Cavera*, 550 F.3d at 191.

## V. Forfeiture

Pastore challenges his $125,000 forfeiture order, arguing that (1) a jury

should have determined the forfeiture amount, and (2) the district court erred in

calculating the amount based on gross receipts of funds that were not directly

traced to any bettor in the gambling scheme. He also argues that the court

determined the forfeiture amount based on insufficient and unreliable evidence.[3]

"We review a district [court's] legal conclusions regarding forfeiture de

novo and [its] factual determinations for clear error." *United States v. Daugerdas*,

837 F.3d 212, 231 (2d Cir. 2016). "For a criminal forfeiture order to pass muster,

---

[3] In his briefs, Pastore challenged the procedural and substantive reasonableness of his sentence. He has since withdrawn as moot his "argument concerning [his] incarceratory sentence." Case No. 18-2482, Doc. No. 153. To the extent that he maintains a procedural challenge to the district court's imposition of forfeiture, Pastore fails to explain how the error he alleges – a factual finding in violation of Federal Rule 32 of Criminal Procedure – affected the forfeiture calculation. Moreover, the record makes clear that this challenge lacks merit. *See* Pastore App'x at 67 (stating that court won't rely on disputed fact at sentencing).

the government must establish, by a preponderance of the evidence, the 'requisite nexus between the property and the offense.'" *Id.* (quoting Fed. R. Crim. P. 32).

Pastore's argument that a jury should have determined his forfeiture amount is foreclosed by Supreme Court and Second Circuit precedent. In *Libretti v. United States*, the Supreme Court held that there is no right to a jury trial on a forfeiture determination, *see* 516 U.S. 29, 49–52 (1995), and this Circuit has since recognized that "*Libretti* . . . remain[s] controlling precedent," *United States v. Stevenson*, 834 F.3d 80, 85–86 (2d Cir. 2016).

Pastore also argues that the district court should have calculated his forfeiture based on *net*, rather than *gross*, proceeds. He cites to *United States v. Masters*, in which the Seventh Circuit "assume[d]" (with little analysis) "that the proceeds to which [18 U.S.C. § 1963] refers are net, not gross, revenues," and dismissed this Circuit's precedent, *United States v. Lizza Industries, Inc.*, 775 F.2d 492, 498 (2d Cir. 1985), as not "square[d]" with the statutory language. 924 F.2d 1362, 1369–70 (7th Cir. 1991). But *Masters* is an outlier; no other circuit to have addressed this issue has agreed with the Seventh Circuit. *See, e.g., United States v. Cadden*, 965 F.3d 1, 38 (1st Cir. 2020); *United States v. Christensen*, 828 F.3d 763, 822–

24 (9th Cir. 2015); *United States v. Simmons*, 154 F.3d 765, 770–71 (8th Cir. 1998); *United States v. DeFries*, 129 F.3d 1293, 1314 (D.C. Cir. 1997).

In any event, we remain bound by this Court's decision in *Lizza Industries*. In that case, after the defendants were convicted under RICO for colluding on bids for publicly funded construction contracts, 775 F.2d at 494, the district court calculated forfeiture "by deducting from the money received on the illegal contracts *only* the direct costs incurred in performing those contracts," *id.* at 498. We affirmed the district court's calculation based on "gross rather than net profits." *Id.* (describing the court's calculation – which deducted only direct costs of performance from gross profits derived under illegal contracts – as "consistent with the purposes of the RICO statute"). In doing so, we explained that "[o]ften[,] proof of overhead expenses and the like is subject to bookkeeping conjecture and is therefore speculative." *Id.* Accordingly, we emphasized that "RICO does not require the prosecution to prove or the trial court to resolve complex computations, so as to ensure that a convicted racketeer is not deprived of a single farthing more than his criminal acts produced." *Id.*

More recently, in *United States v. Peters*, we likewise held that the term "proceeds" in another criminal forfeiture statute, 18 U.S.C. § 982(a)(2), refers to

18

gross receipts rather than net profits, emphasizing that "it should not be necessary for the prosecutor to prove what the defendant's overhead expenses were." 732 F.3d 93, 101 (2d Cir. 2013) (quotation mark and alteration omitted) (noting that a properly "broad reading of 'proceeds' in the context of criminal forfeiture" under RICO should "punish[] 'all convicted criminals who receive income from illegal activity, and not merely those whose criminal activity turns a profit'" (quoting *Simmons*, 154 F.3d at 771)).

Here, Pastore offered no evidence of direct costs that could be deducted from the proceeds he received, and even if he *had* offered such evidence, it is unlikely that this Court's holding in *Lizza Industries* – which contemplated deduction of lawful costs for the performance of illegally obtained construction contracts – would permit deduction of *unlawful* costs incurred in an illegal gambling scheme. *See* Pastore App'x at 54 (district court stating it had received no evidence of "any . . . amounts deducted from" proceeds "received by Mr. Pastore"); *Peters*, 732 F.3d at 101; *cf. United States v. Ofchinick*, 883 F.2d 1172, 1181–82 (3d Cir. 1989) (noting that *Lizza Industries* "did not address whether a district court *must* deduct direct costs," and that "[i]f direct costs need be taken into account, it is the defendant who has the burden of going forward on this issue,"

19

because "[t]he government should not have to prove the absence of direct costs in a case in which the defendant has not pointed to costs that might be deductible"). We conclude that where the district court had no evidence of any direct costs paid out from Pastore's unlawful proceeds, it committed no error and appropriately followed this Court's reasoning in *Lizza Industries* and *Peters* by calculating forfeiture based on the proceeds that Pastore received.

Pastore also argues that the district court erred by including funds not traced to specific bettors in the bookmaking business. Citing to *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), he argues that that the district court was required to trace proceeds from a losing bettor to Pastore himself. We disagree.

In *Honeycutt*, the Supreme Court held that courts ordering forfeiture under 21 U.S.C. § 853(a)(1) cannot hold a defendant "jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." 137 S. Ct. at 1630. This Circuit has not yet determined "whether *Honeycutt*'s ruling . . . applies equally in all respects to forfeiture orders under other statutes," *United States v. Fiumano*, 721 F. App'x 45, 51 n.3 (2d Cir. 2018); *see United States v. Gil-Guerrero*, 759 F. App'x 12, 18 n.8 (2d Cir. 2018), but even if we were to assume that the holding of *Honeycutt* applies equally to

20

forfeiture under the criminal RICO statute, it would not affect the calculation in this case. "While we have not yet fully defined the parameters of *Honeycutt*," we have clarified that the "bar against joint and several forfeiture for co-conspirators applies only to co-conspirators who *never possessed the tainted proceeds of their crimes*." *United States v. Tanner*, 942 F.3d 60, 67–68 (2d Cir. 2019) (emphasis added). So, if a defendant at one point possessed proceeds from criminal activity, he "can still be held liable to forfeit the value of those tainted proceeds, even if those proceeds are no longer in his possession because they have been dissipated or otherwise disposed of by any act or omission of the defendant." *Id.* at 68 (internal quotation marks omitted).

In this case, the government demonstrated that Pastore received payments from runners and thus possessed proceeds from the illegal gambling operation. While the payments may not have always come directly from bettors' hands, we recognize that money is fungible and the payments undoubtedly constituted proceeds from the gambling scheme. The district court's calculation of forfeiture based solely on these illegal proceeds paid to Pastore did not conflict with the Supreme Court's holding in *Honeycutt*, and we thus find no error.

21

Finally, although he conceded below that he received proceeds from the illegal gambling operation, Pastore asserts on appeal that there was insufficient evidence to support forfeiture in the amount of $125,000. In calculating forfeiture, a court "may [rely] on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B); *see United States v. Capoccia*, 503 F.3d 103, 109–10 (2d Cir. 2007).

Here, the court considered evidence, including wiretapped calls and surveillance reports, that the government introduced at a forfeiture hearing to prove Pastore's receipt of at least $125,000 from the gambling operation. Pastore stipulated to the authenticity of this evidence and did not call any witnesses to impeach the reliability of the evidence. The court's finding – "well beyond a preponderance" – that Pastore received $125,000 in proceeds traceable to the gambling operation was not clearly erroneous. Pastore App'x at 94; *see United States v. Gaskin*, 364 F.3d 438, 461 (2d Cir. 2004) ("[T]he government need prove facts supporting forfeiture only by a preponderance of the evidence.").

\* \* \*

22

We have considered Defendants' remaining arguments and conclude that they lack merit.  For the foregoing reasons and those in the concurrently filed opinion, the district court's judgment is AFFIRMED.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court